## Court of Appeals.

October 27, 1903.

## THE PEOPLE v. THOMAS TOBIN.

(176 N. Y. 278.)

1. MURDER—EVIDENCE—INSANITY.

Evidence upon the trial of an indictment for murder reviewed and held sufficient to sustain a verdict convicting the defendant of the crime of murder in the first degree, including as an essential part of such verdict the finding that the defendant was sane when he committed the act.

2. SAME—REFUSAL BY COURT TO APPOINT COMMISSION TO EXAMINE DEFENDANT—CODE CRIM. PROC., SEC. 658.

Where the trial court, at the opening of a trial for murder, upon the request of counsel for defendant, appointed two expert physicians to examine the defendant and report as to his sanity, and after the adjournment had the physicians, together with a third who had had charge of defendant, reported him as sane, the court was justified in denying a motion, based upon the affidavits of defendant's attorneys, for a commission, under section 658 of the Code of Criminal Procedure, to examine and report as to defendant's sanity at the time of the examination, where no evidence is presented to controvert the previous report of the medical experts, except the affidavits of his counsel, which contained few facts and consisted mainly of the expression of their own opinions, unsupported by the affidavit of any physician.

3. SAME—CHARGE AS TO INSANITY.

A charge that "if evidence is given tending to establish insanity, then the general question is presented whether the crime, if committed, was committed by a person responsible for his acts; and upon this question the presumption of sanity and the evidence are all to be considered, and the prosecutor holds the affirmative, and if a reasonable doubt exists as to whether the prisoner is sane or not he is entitled to the benefit of that doubt."

4. SAME.

The court is not bound to charge in the language of counsel, provided the substance of the request was fairly covered in the body of the charge.

5. SAME.

It is not error for the court to charge that it was not "necessary that every circumstance should be proved beyond a reasonable doubt," where the court did not mean that every circumstance, constituting

a link in the chain of circumstances, necessary to establish " the fact of killing by the defendant " need not be proved beyond a reasonable doubt, but that every incidental circumstance, such as those bearing upon the probabilities that the main circumstances were true, or that every fact essential to convict, such as " the death of the person alleged to have been killed," need not be proved beyond a reasonable doubt.

6. SAME—CODE CRIM. PROC., SEC. 528.

Moreover, only errors raised by exception required a new trial, and it is only when the Court of Appeals is satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, that it is permitted to reverse whether an exception has been taken or not in the court below.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of New York December ·22, 1902, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Henry W. Unger and Abraham Levy, for appellant.

William Travers Jerome, District Attorney (Howard S. Gans, of counsel), for respondent.

VANN, J.: The homicide, which is the subject of this appeal, occurred on the 27th of September, 1902. The next month the defendant was indicted, and on the 16th of December following, after a trial which lasted eight days, the jury found him guilty of murder in the first degree and judgment was pronounced accordingly. The counsel who conducted the trial are entitled to the thanks of the court and of the public for the thorough investigation made and the prompt disposition of this important case.

The defendant is thirty-seven years old and has spent about nineteen years of his life in prison. The offenses for which he was thus punished were crimes against property, and he does not

appear to have been charged with a crime against the person until the present accusation was made against him. In October, 1898, he was transferred from the State prison at Dannemora, where he was confined for grand larceny, to the Matteawan Insane Asylum for custody and treatment as an insane convict. On the 13th of December, 1900, he was returned to prison " as recovered." At the time of the homicide he was employed as a waiter at No. 38 West 29th street, in the city of New York, known as the Empire Cafe, a place of resort for prostitutes and their patrons. At 1 o'clock on the morning of September 27, 1902, the police, according to their custom, cleared the place of all occupants except the employees, and during the rest of the night the door leading from the street to the first floor was locked, but access to the premises could be had through a Chinese restaurant in the basement. About an hour later, James Craft, a resident of Staten Island, forty-six years of age, and already under the influence of liquor, entered the basement, where a prostitute began to talk with him, and, upon the suggestion of the defendant, all three went upstairs into the cafe. The defendant brought in beer and whisky ordered by Craft, who, in paying therefor, exhibited a roll of bills amounting to twenty-five or thirty dollars. After that all the employees and other persons left the place, some through the efforts of the defendant, except himself, Craft and McEneaney, who was the barkeeper. Craft and the defendant continued to drink until both were intoxicated, and at about 5 o'clock in the morning there was talk between them, approaching a quarrel, about some change claimed to be due after paying for drinks. After this discussion ended there was silence for about twenty minutes, and McEneaney, who was behind the bar where he could hear but could not see what was going on, testified that he then heard a thud followed by a fall. Going to the door he saw Craft on the floor, bleeding and senseless, and the defendant was jumping on him, tearing his clothes and

kicking him. Craft's face was swollen and covered with blood. McEneaney went over to the defendant, pushed him away and asked him what he was doing. He made no reply, but went downstairs, while McEneaney tried to pour some brandy down the throat of the injured man, but did not succeed " because his teeth were clinched." During his effort he got some blood on his hands, and while he was washing it off in another room the defendant returned, seized the body by the feet and was dragging it downstairs, the head bumping on the steps, when McEneaney took hold of the arms and helped carry the man to the foot of the stairs. McEneaney then said: " Open the Chinese door and give him some air." The body was put down, the defendant went into the Chinese restaurant, McEneaney went upstairs for some more brandy and on his return the defendant had the body in the cellar under the basement, and was standing over it with a butcher's cleaver in his hand. The head was nearly off and the defendant struck the body once with the cleaver in the presence of McEneaney, who asked him what he was doing and pushed him back, but was told to mind his own business. He was afraid the defendant was going to hit him, and when told to take off his shirt, which was bloody, he did so, in fear of his life, and as the shirt came off over his head he pushed Tobin, " with shirt and all," and ran upstairs. He put on his coat and hat, took a drink, picked up a bottle to defend himself and went downstairs quietly, where he saw the defendant holding the head, severed from the body, in his hands and walking toward the furnace in the cellar. He then ran out of doors, called a cab, drove to a station house and informed the police. This is an outline of the story told by McEneaney, who was jointly indicted with the defendant, but was not tried with him. It was corroborated in nearly all respects by the testimony of several witnesses.

When the police arrived they found the body entirely naked, concealed under some rubbish in the cellar. There was a pool

of blood two feet wide near the furnace, with a trail of blood leading to the furnace door. The head and clothing, half charred, were in the furnace, where a fire had been kindled but was nearly out, as the draft did not work. The defendant was found with blood on his hands and clothing hiding in the saloon. He had in his pocket $36 in bills, besides some silver and coppers. A cleaver, old and with a rough edge, was picked up in the cafe and was identified as one kept for use in the Chinese restaurant.

The physician who made the autopsy found all the organs of the body in a healthy condition. Thirteen different blows had been struck with an instrument having more or less of a sharpened edge before the head had been severed. There was a fracture of the skull which would probably have caused death in time, but the surgeon was of the opinion, from the flow of blood and other physical signs, that the man was alive and the heart still beating when his head was cut off.

We will not continue this painful narrative, for the learned counsel for the defendant does not ask us to review the facts; still we have examined them with care, and find that the evidence sustains the verdict, including, as an essential part thereof, that the defendant was sane when he committed the act. The only substantial contest at the trial was over the sanity of the defendant, and upon that issue the weight of evidence was with the People. Four questions of law have been argued before us which we will now consider.

1. On the 4th of December, 1902, when the trial of the indictment was moved, the counsel for the defendant stated that they believed he was insane and asked the court to appoint some competent physician for the purpose of making an examination as to his mental condition. The court thereupon adjourned until the 8th of December, and in the meantime the justice presiding requested two expert physicians, of long experience and high standing, to examine the defendant and

report as to his sanity.    They made an examination and reported that in their judgment the defendant was sane, and a third physician, who at one time had charge of the defendant, concurred in that opinion.    When the court met, pursuant to adjournment, a motion was made in behalf of the defendant, based upon the affidavits of his attorneys, for a commission, pursuant to section 658 of the Code of Criminal Procedure, but in view of the report of the experts appointed by the court the motion was denied.    The case proceeded to trial, and it is now claimed that the denial of the motion was reversible error, but we think this point is not well taken.

The statute authorizes, but does not require, the court to appoint a commission to examine " a defendant who pleads insanity " and report " as to his sanity at the time of the commission of the crime; " or when " a defendant in confinement, under indictment," either before or after conviction, appears " to be insane," the court " may appoint a like commission to examine him and report   .   .   .   as to his sanity at the time of the examination."    (Code Crim. Proc., sec. 658.)    When the motion in question was heard no plea of insanity had been made by the defendant, but this is not important because the application was for a report as to his mental condition at the time of the proposed examination.    The court was authorized to appoint a commission for this purpose, provided the defendant appeared to be insane when the motion was made. Since eminent medical experts, appointed informally upon the suggestion of the defendant's counsel, had within a day or two, after personally examining him, reported that he was sane, how could the court decide that he appeared to be insane when no evidence was presented to show it, except the affidavits of the counsel themselves, who did not claim to be experts, and who presented no supporting affidavit from any physician ? Their affidavits contained few facts and were confined mainly to the expression of their own opinions.    The facts, except the

confinement of the defendant in the Matteawan Asylum, related to acts and words of the defendant which may have been feigned, and which it is reasonable to believe, in view of the testimony subsequently given at the trial, were in fact feigned. The question was within the sound discretion of the court, and we think it was discreetly exercised. The subject was thoroughly discussed in a recent case, the facts of which were so analogous as to make it controlling. (People v. McElvaine, 125 N. Y. 596, 605.)

2. In charging the jury upon the question of insanity the court said: " Sanity being the normal and usual condition of mankind, the law presumes that every individual is in that state. Hence the prosecution may rest upon that presumption. Without other proof, the fact is deemed to be proved prima facie. Whoever denies this or interposes a defense based upon its untruth, must prove it. The burden, not of the general issue of the crime by a competent person, but the burden of overthrowing the presumption of sanity or of showing insanity, is upon the person who alleges it. And if evidence is given tending to establish insanity, then the general question is presented to the court and jury whether the crime, if committed, was committed by a person responsible for his acts. And upon this question the presumption of sanity and the evidence are all to be considered, and the prosecutor holds the affirmative, and if a reasonable doubt exists as to whether the prisoner is sane or not, he is entitled to the benefit of that doubt."

The counsel for the defendant claims that it was error to instruct the jury upon the vital question in the case that the presumption of sanity and the evidence are all to be considered. He argues that the function of the presumption with which the trial starts is ended when evidence has been given tending to show that the defendant is insane; that thereupon the presumption becomes functus officio and the case proceeds as if it had never existed; that the burden of proof thus thrown

upon the prosecuting officer requires him to establish sanity by evidence, without any aid from the dead presumption, which is not evidence; that the only use of the presumption is to relieve the People of the necessity of proving sanity in the first instance, and when it has been overthrown by evidence for the defendant, while the jury may consider it they are not required to and should not be told by the court that it is their duty to.

This point was not raised by an exception, and the portion of the charge above quoted was taken verbatim et literatim from the opinion in Brotherton v. People (75 N. Y. 159, 162). That case has been cited and followed so faithfully for a quarter of a century, both by trial courts and appellate courts, including ourselves, that we regard it as the established law of the State, and while we appreciate the argument of counsel upon the subject, discussion is foreclosed, for the question is not open to consideration.

3. The defendant asked the court to charge the jury that if they " entertained a reasonable doubt from the evidence in the case as to the sanity or insanity of the defendant at the time of the commission of the act charged in the indictment he is entitled to the benefit of that doubt and must be acquitted." The court declined to vary his charge, and an exception was taken.

In the body of the charge the court carefully defined reasonable doubt and told the jury, among other things, that " Whether the defendant killed Craft is a question of fact which you must determine from all the evidence in the case, and that must be established beyond a reasonable doubt."    " If the People have failed to establish by the evidence, beyond a reasonable doubt, that there was premeditation and deliberation, then the prisoner is entitled to the benefit of that doubt." " Before you can find the defendant guilty of murder in the first degree, it is necessary that the facts should satisfy you beyond a reasonable doubt that the defendant struck the de-

ceased with a deadly weapon, and that he had in his mind at the time he struck the blow, or blows, or beheaded him, a deliberate and premeditated design to kill him." "You must be convinced of the prisoner's guilt beyond a reasonable doubt. . . ." "If you are satisfied beyond a reasonable doubt of the guilt of the prisoner, it will be your duty to say so." "If a reasonable doubt exists as to whether the prisoner is sane or not, he is entitled to the benefit of that doubt." "But it all rests upon your good judgment to determine . . . whether this defendant knew the nature of the crime that he was committing, whether he knew that he was doing a wrongful act or not. If you entertain a reasonable doubt upon that point he is entitled to the benefit of that doubt." "If you reach the conclusion from the evidence that the defendant is innocent, it is your duty to acquit him, but, on the other hand, if you come to the conclusion from the evidence beyond a reasonable doubt that the defendant committed the crime, and that he was sane when he committed it, then it is your duty to find him guilty."

At the close of the charge the counsel for defendant asked the court to instruct the jury that "When the defense of insanity was interposed in this case and throughout the case this defendant is entitled to the benefit of the reasonable doubt resting upon the question of insanity." The court remarked that he had charged that, and when further asked to charge it in those words said it was unnecessary, but added, "I charge the jury that if they have a reasonable doubt as to his sanity he is entitled to the benefit of that doubt." The learned justice further said: "Gentlemen, after the insanity is first established or the defendant's witnesses give testimony tending to show that the defendant is insane, it then devolves upon the People to satisfy you beyond a reasonable doubt that at the time he committed the homicide he was sane." Upon the request of the defendant he also charged: "That the defense

of insanity interposed here by the defendant need not be proven beyond a reasonable doubt." Then followed the request, with reference to which the exception was taken.

It is claimed that the court did not make it clear, while the request did, that the defendant should be acquitted if the jury had a reasonable doubt as to his sanity. It would be very remarkable if the jury failed to understand the effect of a reasonable doubt, and that if they entertained it as to any one of the various elements of guilt, they should acquit the defendant. How could they give him the benefit of a reasonable doubt, as they were repeatedly told to in certain contingencies, except by acquitting him? They were told what the People were bound to show beyond a reasonable doubt in order to convict, and that the defense of insanity relied upon by the defendant need not be proved beyond a reasonable doubt. How could they observe these directions, or give any effect to them, except by finding a verdict of acquittal, if a reasonable doubt existed in their minds as to the sanity of the defendant? We find no error here, for the court, as we have repeatedly held, was not bound to charge in the language of counsel, provided the substance of the request was fairly covered, as we think it was. (People v. Pallister, 138 N. Y. 601.)

4. It is further claimed, although the point was not raised by an exception, that it was error for the court to charge that it was not " necessary that every circumstance should be proved beyond a reasonable doubt."

The court did not mean by this that every circumstance constituting a link in the chain of circumstances necessary to establish " the fact of killing by the defendant " need not be proved beyond a reasonable doubt, but that every incidental circumstance, such as those bearing upon the probabilities that the main circumstances were true, or that every fact essential to convict, such as " the death of the person alleged to have been killed," need not be proved beyond a reasonable doubt. (Penal Code, sec. 181.)

Moreover, it is to be remarked that only errors raised by exception require a new trial, and it is only when we are satisfied that the verdict was against the weight of evidence, or against law, or that justice requires a new trial, that we are permitted to reverse whether an exception shall have been taken or not in the court below. (Code of Crim. Proc., sec. 528.) In this case we think the verdict was right and that it was based upon evidence that is clear and convincing. We do not think that it was against the weight of evidence, or against law, or that justice requires a new trial, and hence, owing to the absence of an exception, we are not at liberty to exercise a discretion confided to us for the protection of persons under sentence of death, as to whose guilt we may have some doubt. Exceptions are still necessary, notwithstanding the statute, to fully protect the rights, and especially the technical rights, of a person on trial, even for a capital offense. This is just, for if an exception is taken, the court, warned by the challenge, may correct the error on the spot and thus avoid the expense and delay involved in case a new trial should be ordered.

As we find nothing to justify a reversal, the judgment must be affirmed.

PARKER, Ch. J., GRAY, O'BRIEN, BARTLETT, HAIGHT and MARTIN, JJ., concur.

Judgment of conviction affirmed.