THE PEOPLE OF THE STATE OF NEW YORK ex rel. STEPHEN KLESITZ, Relator, against GEORGE W. MILLS, as Superintendent of Creedmoor State Hospital, Respondent.*

Supreme Court, Special Term, Queens County, July 30, 1942.

* See, also, *People* v. *McDermott,* 179 Misc. Rep. 89.

Raymond Keran O'Brien for relator.

John J. Bennett, Jr., Attorney-General (Francis X. Wazeter of counsel), for respondent.

FROESSEL, J. On a writ of habeas corpus, the relator herein, Stephen Klesitz, husband of Theresa Klesitz, who is forty-five years old and the mother of four children, challenges her commitment by a city magistrate to the Creedmoor State hospital. The record before me discloses that she was charged in the Magistrate's Court of the City of New York, Borough of Queens, with the offense of disorderly conduct (Penal Law, § 722, subd. 2), for "making false and malicious remarks" to the complainant, one Ada Meyer. On February 19, 1942, she was committed by the magistrate to Bellevue hospital for mental observation. While there, and on March 3, 1942, she was taken before a justice of the Supreme Court, Honorable BERNARD L. SHIENTAG, as upon an application under article 5 of the Mental Hygiene Law (Cons. Laws, ch. 27), and said justice found her incompetent, but stated that he would "parole her in the custody of her husband." No order appears to have been signed by said justice, apparently in view of the fact that the charge in the Magistrate's Court was pending against her.

The acting director of the psychiatric division of Bellevue hospital and the two designated qualified psychiatrists, appointed pursuant to the provisions of sections 870 and 659 of the Code of Criminal Procedure, thereupon reported to the Magistrate's Court, under date of March 3, 1942, that their examination revealed that the patient was presently insane; the report then relates the proceedings before Mr. Justice SHIENTAG; and with reference to her proposed parole in the custody of her relatives, it stated:

"One of the undersigned physicians (FJC) objected to this plan, stating that the patient developed ideas of persecution against one person and then against another and that whereas she had been friendly with Mrs. Meyer, she now is her chief enemy. The undersigned further pointed out that the patient was in *his* opinion potentially homicidal and that *he* had been informed by Mrs. Meyer, the complainant, that the patient had made threats to harm her." (Italics mine.)

"Justice SHIENTAG stated that in his opinion the patient was insane but that she did not need to be in a hospital and that he would commit her to the custody of her husband with the understanding that she would leave her present environment and that she would have regular treatment by a recognized psychiatrist in private practice or that she would regularly attend a psychiatric clinic. It was pointed out to the court that the patient still had a charge pending against her in the Magistrate's Court and Justice SHIENTAG therefore ordered her returned to the Magistrate's Court and stated that the Court should be informed that he had adjudged the patient mentally sick.

"In conclusion, it is our opinion that this patient is in such a state of insanity as to be incapable of understanding the charge against her or the proceedings or making her defense."

Thereafter, relator's wife was returned to the Magistrate's Court, and the minutes of said hearing are before me. They state that the hearing was held on March twenty-fourth, but this is manifestly an error, for it appears that the correct date should be March fourth. Much needless colloquy took place between the magistrate and the attorney for relator's wife concerning, among other things, alleged interference, whatever that may mean, but no testimony was taken. The minutes also show that the hearing was finally adjourned, the magistrate stating: "I won't parole her until I get the say-so from the psychiatrists. Adjourned to March 25." The white back, forming part of the court record, showed the same disposition, but this was stricken out and underneath are the words: "Atty waives Hearing. Committed to Creedmoor State Hospital 3/4/42," and the signature of the magistrate. The minutes make no reference to this waiver in any way whatever, and the relator denies that his wife waived anything or authorized her attorney to do so. On the same day, an order was made by the magistrate committing relator's wife to the Creedmoor State hospital "for custody, treatment and care, until discharged according to law." There she has remained to this day, having thus been in custody since

February 19, 1942, or for a period now approaching six months.

By this application, the relator attacks the foregoing proceedings. His contentions, so far as I can understand them, are (1) that such of the proceedings aforementioned as took place before Mr. Justice SHIENTAG constituted *res judicata,* and precluded the magistrate from making any other determination; (2) that in any event, the commitment by the magistrate invaded the constitutional rights of his wife in that (a) it deprived her of the right of trial by jury and (b) it deprived her of her liberty without due process of law; and (3) that the proceedings in any event were legally faulty.

The Attorney-General, on the other hand, contends that the proceedings before the magistrate were authorized by sections 870 and 659–662-c of the Code of Criminal Procedure (as added by L. 1939, ch. 861) that there is no merit in relator's contentions, and that the sole question before this court is whether the magistrate had the power to commit Theresa Klesitz by his aforesaid order of March 4, 1942.

(1) I see no merit in relator's first contention that the proceedings before Mr. Justice SHIENTAG, hereinbefore referred to, constituted *res judicata* and precluded the magistrate from acting here. While it does not appear from the minutes of the hearing before him, which is the only record before me, how the relator's wife came before the said justice, it is apparent that she was produced at the hospital, as is the customary practice, by the hospital authorities, together with other "patients" not under criminal charges, so that the justice might determine whether or not to commit her under the provisions of article 5 of the Mental Hygiene Law. However, sections 70 and 74 of that law exclude from its operation persons "in confinement on a criminal charge," and in view of the proceedings pending before the magistrate, it would seem that the appearance of relator's wife before said justice was unauthorized. (Code Crim. Proc. § 662-d; L. 1939, ch. 861, § 2; now § 662-f.) In any event, while it is not entirely clear, the minutes indicate, and the psychiatrists' report so certifies, that Mr. Justice SHIENTAG, while finding the relator's wife incompetent, and willing to parole her in the custody of her husband, acquiesced in her return to the Magistrate's Court.

(2) Relator's more serious challenge that his wife's constitutional rights have been violated may now be considered. His first contention in this connection is that the statutes under which she was committed do not afford her a jury trial, as guaranteed under section 2 of article 1 of the Constitution of

the State of New York. Clearly, the provisions of the Federal Constitution can have no application, in any event. (*Maxwell* v. *Dow*, 176 U. S. 581; *Palko* v. *Connecticut*, 302 U. S. 319; *United Gas Co.* v. *Texas*, 303 U. S. 123, 141.)

It is common knowledge that sections 870 and 658–662-c of the Code of Criminal Procedure, enacted in 1939 and known as the Desmond Act, sought to provide a new method by which criminal courts may obtain expert medical opinion on the question of the *present* mental condition of any defendant, concerning whom there is reasonable ground for believing that he is in such a state of insanity as to be incapable of understanding the charge or proceedings or of making his defense, and to correct the former over-formal procedure, expense and inefficiency of the lunacy commission system. The term "*present* mental condition" of a defendant as here used is to be distinguished from mental condition at the time of the commission of the crime.

At the outset, it should be emphasized that we are not concerned here with the right to a jury trial of a defendant who has pleaded insanity to a criminal charge as a defense, where the criminal charge is ordinarily triable by a jury (in the instant case, disorderly conduct is in no event so triable), for there mental condition at the time of the commission of the crime is directly involved in proof of the crime itself (*People* v. *Egnor*, 175 N. Y. 419); nor with an application for the appointment of a committee under article 81 of the Civil Practice Act, where section 1364 provides for a jury (see Report of the Law Revision Commission [1939], pp. 327, 353 et seq.); nor with an application under the provisions of article 5 of the Mental Hygiene Law, where a jury may also be had under section 76 (formerly § 73) if suitably demanded. It should also be borne in mind that commitment to a State hospital is not an adjudication of insanity. (*Finch* v. *Goldstein*, 245 N. Y. 300.)

Neither under the common law (3 Coke Inst. 4; 4 Blackstone's Comm. 24, 395, 396; 1 Hale P. C. 34, 35; *Freeman* v. *People*, 4 Den. 9), nor under our statute (Penal Law, § 1120), may a person be tried on a criminal charge while he is in a state of insanity so as to be incapable of understanding the proceeding or making his defense. This principle is universally accepted in this country, but its application in practice has produced much confusion.

As to the right of a defendant to a jury trial on this issue of present insanity, the better view appears to be that at common law, such right did not exist. In one of the early cases, where

Dr. Charles Bateman was tried for high-treason "for conspiring the death" of Charles II, this issue was not submitted to a jury, but the court, apparently observing that Bateman "seemed to be distracted," permitted his son "to make his father's defense, which was an extraordinary unparalleled favour; it was the first and last time that, or anything like it, had been done." (*Trial of Charles Bateman,* 11 How. St. Tr. 467, 474–476 [1685].) Lord Hale stated the practice as follows: " * * * the judge before such respite of trial or judgment may do well to impanel a jury to inquire *ex officio* touching such insanity, and whether it be real or counterfeit * * *. But in case a man in a phrenzy * * * is put upon his trial, and it appears to the court * * * that he is mad, the judge in discretion may discharge the jury of him, and remit him to gaol to be tried after the recovery of his understanding." (1 Hale P. C. 34, 35.)

It is true that now and then, in such cases as in the proceeding of *John Frith* (22 How. St. Tr. 307, 311), a jury was allowed, the court there stating: "There ought now to be an inquiry made, touching the sanity of this man at this time," but whether it was granted as a matter of right or as an aid to the court is not indicated. Hume writes an interesting note on this case, which may be found in 22 Howell's State Trials, 1254, 1255, in the course of which he says: "It thus seems to be doubtful at least, if we have yet sufficient authority for annexing to the province of the jury, a pre-judicial inquiry of this nature * * * ." That there was need for legislation to make this right clear is indicated by Parliament's enactment in 1800 of a law directing a jury trial in these cases. (39 & 40 Geo. III, ch. 94 [1800].) In any event, the *Frith* case was decided in 1790 and after the State of New York was organized as a Government, and after the adoption of our first State Constitution on April 20, 1777.

In our own State of New York, it does not appear that any court has ever held that a jury trial is constitutionally required to determine the issue of *present insanity* in criminal cases. On the contrary, in *Freeman* v. *People* (*supra* [1847]), the court stated (at p. 20): "The statute is explicit that 'no insane person can be tried,' but it does not state in what manner the fact of insanity shall be ascertained. That is left as at common law: and although, in the discretion of the court, other modes than that of a trial by a jury may be resorted to, still, in important cases, that is regarded as the most discreet and proper course to be adopted." In *People* v. *Rhine-*

*lander* (2 N. Y. Crim. Rep. 335, 340 [1884]), it was asserted that "both at common law and by statutes existing prior to the adoption of the Code" our criminal courts could "inquire into such matters by and with the aid of a jury, or in such other way as may be found to be discreet and convenient." (See, also, *People* v. *McElvaine,* 125 N. Y. 596; *People* v. *Tobin,* 176 N. Y. 278; an excellent article entitled "The Determination of Insanity in Criminal Cases" by Dr. Sam Parker, Cornell Law Quarterly [1941], p. 375; Weihofen on Insanity as a Defense in ·Criminal Law [1933], pp. 334, 355; Code Crim. Proc., former §§ 658–662.) In the light of the foregoing, it is my opinion that a trial by jury of the incidental issue of *present* insanity in this case, where the magistrate had complete jurisdiction of the offense, as well as of the person, is not a constitutional right.

We are then confronted with the next point urged by relator, namely, that the statutes in question invade his wife's rights under the due process clause of the 14th Amendment of the United States Constitution.

Section 870 of the Code of Criminal Procedure, so far as pertinent here, provides: "1. If at any time it shall appear to a court having jurisdiction of a defendant charged * * * with an offense not a crime * * * that there is reasonable ground for believing that such defendant is in such state of * * * insanity that he is incapable of understanding the charge or proceedings or of making his defense * * * the court * * * may in its discretion stay the proceedings and order such defendant to be examined to determine the question of his sanity, and the procedure therefor shall be as set forth in sections [659–662-c]."

These latter sections provide for the examination of a defendant by qualified psychiatrists chosen, in the city of New York, by the director of the division of psychiatry of the department of hospitals from his staff; that upon completion of such examination such director is required to transmit to the court a full and complete report, including the findings of the qualified psychiatrists, which "report *shall include* a recommendation as to the appropriate institution to which such defendant should be sent if committed." Section 662-a (as added by Laws of 1939, ch. 861) provided: "If two of such psychiatrists certify that such defendant is in such state of * * * insanity, and the court *after giving the district attorney and counsel for the defendant opportunity to be heard thereon, concurs in such finding,* the trial must be suspended until he becomes sane and the court shall commit the defendant to a state hospital for the

insane either of the department of correction or of the department of mental hygiene." (Italics mine.)

When the statute expressly provides that counsel for the defendant shall have an "opportunity to be heard," it assumes that he has the right to test the basis of the subject-matter of the inquiry by cross-examination of the witnesses, including the right of confrontation of the psychiatrists, as well as the right to offer evidence and produce witnesses on defendant's behalf which may affect the conclusion by the court upon facts of record, should he desire to avail himself of that right. (*Matter of Long,* 287 N. Y. 449, 454, 455.) Moreover, when the statute requires that the court "concur(s) in such finding," the magistrate here (who had complete jurisdiction of the *offense* with which relator's wife is charged [Penal Law, § 724], as well as over her *person*), and not the psychiatrists, makes the final determination. Thus we have a judicial examination with an opportunity to the defendant to be heard, that fully meets the requirements of, and adequately safeguards the fundamental rights embraced in, the concept of due process. (*Minnesota ex rel. Pearson* v. *Probate Court,* 309 U. S. 270; *Chaloner* v. *Sherman,* 242 U. S. 455; *People ex rel. Witherbee* v. *Supervisors,* 70 N. Y. 228, 234.)

More than that, a person committed or an accused always has the right to resort to the ancient and constitutional remedy of habeas corpus in the Supreme Court at any time (*People ex rel. Peabody* v. *Chanler,* 133 App. Div. 159; affd., 196 N. Y. 525; Mental Hyg. Law, § 204; Civ. Prac. Act, art. 77), when a jury trial may also be granted in the discretion of the court. (*Hoff* v. *State of New York,* 279 N. Y. 490.)

In the light of the foregoing views I am of the opinion that the statutes in question do not invade the constitutional rights of relator's wife with respect to due process.

(3) The question remains as to whether or not the relator's wife was properly committed pursuant to the statutes aforesaid. Reference has already been made to the fact that no testimony of any kind was taken on the hearing before the magistrate on March 4, 1942. It is only fair to state that the magistrate offered such opportunity, whereupon counsel for relator's wife asked for an adjournment of three weeks, which was granted as hereinbefore stated. While the minutes show nothing more, the magistrate's record, already referred to, indicates that after the granting of the adjournment something else took place, possibly a conference between the court and counsel, and the attorney is recorded as having "waived hearing," knowledge of or consent to which is disclaimed by relator and his wife.

But further difficulties present themselves here. The report of the director and the two psychiatrists, dated March 3, 1942, was before the magistrate on the day of the aforesaid hearing. This report did not contain any "recommendation as to the appropriate institution to which such defendant should be sent if committed," as *required* by section 662 of the Code of Criminal Procedure, though it made a passing reference to Creedmoor State hospital in some other connection. Moreover, while such report concluded "that this patient is in such a state of insanity as to be incapable of understanding the charge against her or the proceedings or making her defense,"· *it does not contain the additional statement* either (a) that "they deem the defendant's discharge not dangerous to the public peace and safety," as required by subdivision 2 of section 870 of the Code of Criminal Procedure, so that the court might exercise its discretion to "release the defendant on bail or parole him," as authorized by said section, or (b) that "they deem the defendant's discharge dangerous" (subd. 3). It is true that the report stated that "One of the undersigned" objected to the plan of parole, and that "the patient was in his opinion potentially homicidal and that he had been informed by Mrs. Meyer, the complainant, that the patient had made threats to harm her," but the other two physicians did not so state. The court was entitled to know, under the statute, from all of the psychiatrists whether or not they deemed the defendant dangerous.

This was particularly important in the light of what took place before Mr. Justice Shientag, though his opinion may not have been controlling, and it was also important in view of the fact that the record shows that on February 13, 1942, five days before commitment for observation, the Acting Medical Superintendent of Queens General Hospital, who it would appear was asked to report to the Magistrate's Court as to this very patient, did so, in part, as follows: "Ordinarily in such a case the Mental Hygiene Clinic advises that the patient be admitted to a psychiatric institution for a period of observation, especially since there is a possibility that Mrs. Klesitz might, when under particular emotional stress, harm somebody. However, patient's daughter and also her lawyer are opposed to such a period of observation.

"I have discussed this case with the Chaplain of this hospital, Father Griffin, who was kind enough to interview the patient and her family. He feels that he can influence the patient for the better, and *under these circumstances, I would advise that Mrs. Klesitz be discharged in the custody of her attorney and of Father Griffin.*" (Italics mine.)

When this faulty procedure is considered in the light of the informality of the hearing before the magistrate, it becomes serious. This requirement of the statute, as to whether or not the psychiatrists deemed the accused dangerous, applies only to *offenses,* such as disorderly conduct, and not to felonies or misdemeanors, for the very obvious reason that the Legislature did not intend persons so charged to be committed to hospitals for the insane by magistrates unless they were "dangerous to the public peace and safety."

Under all these circumstances, I am constrained to conclude that the commitment was not made in accordance with the statutes, and the writ must accordingly be sustained. The fact that relator's wife is charged with the simple offense of calling a neighbor names, makes it no less important that orderly procedure be adhered to, particularly when one realizes that for such an alleged offense, she has already been confined for a period that approaches the maximum sentence that a magistrate is empowered to impose, if she were found guilty. Inasmuch as relator, on the present application, merely attacks the statutes and the proceedings before the magistrate and does not request a new hearing as to his wife's *present* mental condition, she will be remanded to the Magistrate's Court so that proper lawful proceedings may be followed.

Settle order on notice.