Gustave G. Rosenberg, J.
The claim herein for damages in the sum of $20,000,000 is based on claimant’s confinement to Creedmoor State Hospital from June 27, 1957 to January 24, 1958, and in the Matteawan State Hospital from January 24, 1958 to November 1, 1966.
The claim was duly filed and has not been assigned or submitted to any other court or tribunal for determination.
The trial of this claim was held at the State Office Building in the City of New York on March 16, 17, 18, 19, 23 and April 23, 24, 29 and 30, 1970. The claim includes nine separate and independent causes of action.
On May 13, 1957 claimant then 56 years of age was arrested in the City of New York on the charge of having committed a felonious assault on one Sam Smith by means of stabbing him mistakingly believing him to be a Judge who had dismissed a damage suit for $8,000,000 against several State officials and Judges. On May 14, 1957 she appeared in the Magistrate’s Court in New York City before Judge Nicoll, represented by counsel, and certain colloquy occurred between the court and claimant’s private counsel. Subsequently that same night the Magistrate signed an order committing the claimant to Kings County Hospital for a mental examination and observation not to exceed 60 days. The commitment was *980 consented to as evidenced by a handwritten notation in the margin of the order: “ Consented to by Jacob Friedman, Esq. Atty for defendant, /s/ J. Nicoll
Thereafter on June 27, 1957 the claimant was admitted to Creedmoor State Hospital pursuant to an order of commitment issued by the Supreme Court of Kings County on June 24, 1957 based upon two physician certificates finding the claimant to be a mentally ill person. Pursuant to section 872 of the New York Code of Criminal Procedure, personal service of the petition for the commitment was made upon the claimant, setting forth the return date, place and time of the hearing to be held before a Justice of the Supreme Court. In addition service was made by mail upon claimant’s counsel. A hearing was held and a commitment order was signed, providing that the claimant be admitted to Creedmoor State Hospital for a period not exceeding 60 days, unless within that period of time the Director of the Hospital certified that the patient is in need of further care and treatment. Such a certificate was duly filed and the commitment order became final. (See People ex rel. Jacobs v. Director of Gowanda State Hosp., 19 A D 2d 858.)
On July 16, 1957 an indictment was returned in the Court of General Sessions of New York County charging claimant with the crime of assault, first degree. The claimant having already been committed to Creedmoor State Hospital at the time the indictment was returned, the warrant was lodged with the Director of Creedmoor and pursuant to section 872, all further proceedings were continued.
On January 24, 1958 the claimant was transferred to Matteawan State Hospital in accordance with section 872 of the Code of Criminal Procedure, pursuant to an order issued by the Commissioner of the Department of Mental Hygiene. This transfer had been preceded by proceedings which had been instituted on July 18, 1957 pursuant to section 76 of the Mental Hygiene Law for a review and redetermination of the order certifying claimant to Creedmoor. The claimant’s application for review was supported by a verified petition of her attorney and was made returnable on July 24, 1957 before a Justice of the Supreme Court, other than the one who made the original certification. On the return day the application was placed on the Motion Calendar but was marked withdrawn with the consent of the State and claimant’s counsel. The application was never renewed.
A review of the carefully documented and analytical opinion by United States District Court Judge Edelstein filed July 21, *981 1964 reveals that the issues of all proceedings regarding the claimant from the time of her hearing in. Magistrate’s Court on the charge of felonious assault, up to and including her admission to Matteawan State Hospital, have been heard and determined in the case of United States of America ex rel. Morgan v. Wolfe, (232 F. Supp. 85). The case was a habeas corpus proceeding brought in the United States District Court, Southern District of New York. The claimant was represented by counsel and the State of New York by the Attorney-General.
Since a consideration and determination of the issues of the claimant’s commitment to Creedmoor State Hospital, and her subsequent transfer to Matteawan State Hospital were necessary for a determination in the District Court action, and were actually litigated and determined, the claimant would be barred by collateral estoppel to relitigate these issues. (See Schuylkill Fuel Corp. v. Nieberg Realty Corp., 250 N. Y. 304.) We quote pertinent remarks from Judge Edelsteiit’s opinion (supra, pp. 96-100) :
“ But to contend, as does petitioner’s counsel, that the record before the magistrate in petitioner’s case both ‘ in and dehors the record ’ was totally devoid of evidentiary support is to ignore compelling facts. First, the magistrate had an opportunity to observe the petitioner and to hear her statements that she was receiving treatments for ‘ holes in her bone structure, ’ statements which standing by themselves might not be considered unusual. But of equal importance with the magistrate’s observation of the defendant is the fact that the Magistrate’s Court file contained a letter from the physician in-charge at the Women’s House of Detention that petitioner attempted suicide, appeared to be living in a world of her own, and needed mental observation for her own safety. Even if the magistrate had not had before him matters dehors the record, i.e., petitioner’s prior commitment at Harlem Valley State Hospital, and the circumstances of her vengeful assault upon one whom she mistook for the judge who had dismissed her damage suit, the record before the magistrate, nevertheless, provided him with adequate evidentiary support for ordering her commitment pursuant to § 870 of the Criminal Code. See People ex rel. Schildhaus v. Warden of City Prison, supra.
“ Petitioner’s contention that Magistrate Nicoll had no authority to commit petitioner to Kings County Hospital but had jurisdiction to commit her only to Bellevue is totally without merit. Sec. 870 specifically mentions both hospitals as places where the examination of a defendant may take place.
*982 “ There is also no merit to petitioner’s claim concerning the alleged denial of Due Process in the proceeding culminating in the final commitment order of the Kings County Supreme Court. An examination of the stenographic transcript and the record as a whole, indicates that petitioner was provided with repeated opportunities to present rebuttal psychiatric testimony and each of the procedural steps prescribed by § 872 was followed.
“ Petitioner’s counsel seeks to make moment of the fact that petitioner was not present at every stage of the proceeding. .The judge’s exercise of his discretion, apparently out of concern for petitioner’s welfare in excluding her from the room -during a portion of the hearing, was not in violation of her right pursuant to State law and did not vitiate the proceedings. Petitioner’s counsel would have this Court believe that the petitioner was deprived of her right to call witnesses in her own behalf, subpoena witnesses, conduct cross-examinations, merely because she did not exercise those rights, although ample opportunity was afforded her to do so. Of. Sporza v. German Savings Bank, 192 N. Y. 8 * * *; In re Coates, 9 N Y 2d 242 * * . *; People ex rel. Klesitz v. Mills, 179 Misc. 58 " * * *.
“ * * # The order of Kings County Supreme Court certifying her to Creedmoor was, by its own terms, not to be deemed final until the Director of Creedmoor filed a certificate within 60 days of the entry of the court order certifying that petitioner was mentally ill and in further need of medical treatment. Of. In re Becker, 198 Mise. 219 * * *.
# # #
“An analysis of petitioner’s contentions leads to the conclusion that she was deprived neither of due process nor of equal protection by the failure of the Commissioner of Mental Hygiene, or his delegate to provide her with notice and hearing of her transfer. * * *
“ Although petitioner’s condition at the time of her arraignment precluded the state from proceeding further with the indictment, her commitment did, however, arise out of a pending criminal charge. Her commitment under civil process was as a defendant who was charged with a felony for which she was subsequently indicted. N. Y. Code of Criminal Procedure § 872. The indictment for felonious assault returned on July 16, 1957, was lodged with the director of the institution where she is committed. See People v. Delfs, 31 Mise 2d 655,
*983 # * #
“ Petitioner’s claim of constitutional deprivation concerns the need for a hearing resulting from a claimed reduction of her rights as a result of her transfer to Matteawan. Petitioner urges that Creedmoor is a civil institution under the jurisdiction of the Department of Mental Hygiene while Matteawan is a penal institution — a ‘ prison ’ — where she claims she is forced to suffer under even more onerous strictures than were imposed upon her during her previous confinement at Creed-moor. The purported severity of the security and disciplinary restrictions at Matteawan made it mandatory under the due process clause, she urges, to give her notice and hearing of the impending diminution of her rights via the transfer route.
“ Matteawan State Hospital is a hospital for the criminally insane but is not a prison, as petitioner contends. The State does admit, however, the greater security measures are taken at Matteawan so ‘ as to prevent the possibility of escape, injury to other patients, to prevent riot and injury to the residents of the community in which the hospital is located. * * * ’ See United States ex rel. Carroll v. McNeill, 294 F. 2d 117, 121 * * * vacated as moot, 369 U. S. 149 * * *. But the fact that greater security measures are, in fact, imposed at Matteawan does not require this court to impose upon the 'State the obligation to grant a hearing to a mentally ill criminal defendant concerning the propriety of the decision to transfer her summarily to a maximum security institution. People ex rel. Sacconanno v. Shaw, supra.
“It is evident that petitioner suffered no £ diminution ’ of her rights as a result of her transfer to Matteawan. The Kings County Court that heard the petition for civil certification had the absolute discretion under § 872 to commit petitioner, as a defendant charged with a felony either to Matteawan or to a hospital under the jurisdiction of the Department of Mental Hygiene. * * *
“ * * * The court finds that that portion of § 872 that authorizes the transfer, without a hearing, of a committed criminal defendant to any institution of the Department of Correction or the Department of Mental Hygiene is not violative of the Due Process clause of the Fourteenth Amendment as it applies to petitioner.”
However, proof with respect to these issues was admitted by this court on this trial, and from the proof elicited and all of the exhibits admitted into evidence, we find that the claimant was admitted to Creedmoor upon a valid order of commitment. She was properly retained there pursuant to a certificate of *984 further care and treatment, duly filed by the Assistant Director of Creedmoor State Hospital. She was duly transferred to Matteawan State Hospital in accordance with section 872 of the Code of Criminal Procedure (Harty v. State of New York, 29 A D 2d 243, affd. 27 N Y 2d 698). If, as in this case, too, the original certification by two physicians and a court of competent jurisdiction, is valid on its face, there can be no liability in the absence of negligence or fraud. (See Douglas v. State of New York, 296 N. Y. 530; Warner v. State of New York, 297 N. Y. 395.)
The issues that remain and with which this court concerns itself are:
1. Were the State doctors negligent in failing to provide proper psychiatric examination and care? (See Stone v. Goodman, 241 App. Div. 290, 295; Whitree v. State of New York, 56 Misc 2d 693, 699.)
2. Did the State’s doctors provide adequate medical treatment to the claimant for her physical ailment?
3. Was the claimant illegally detained at Matteawan from January 24, 1958 to November 1, 1966, or any part thereof?
4. Was the claimant assaulted at Matteawan Hospital?
For the purpose of determining the issue of claimant’s mental condition while at Matteawan, we will give little weight to the denial of the three writs of habeas corpus brought by claimant during her hospitalization bearing in mind that claimant was not represented by counsel. (See Whitree v. State of New York, supra). Thus we give claimant the benefit of every consideration though we are mindful of the ruling in Rosario v. State of New York (51 Misc 2d 790, revd. on other grounds 33 A D 2d 122).
Claimant, in support of her allegations, produced Dr. George Scholl Cattanach. He testified that 15 days prior to a trial set before a Supreme Court Justice of Dutchess County and a jury, in connection with habeas corpus proceedings brought in the claimant’s behalf, returnable October 24, 1966, he had seen and talked with her. Further that he testified at said proceedings that she was competent to stand trial, and the jury on October 25, 1966, decided that claimant was competent to stand trial. He further stated that from his examination heretofore mentioned he concluded that claimant was ill, mentally sick, “ I disagreed thoroughly with the diagnosis that the hospital had established. The diagnosis was schizophrenia paranoid type. Now what I saw was something much more serious than that. She was not the schizophrenic with deterioration, she was a victim of a psychoneurosis, an anxiety reaction, a depressive *985 reaction, and a compulsive reaction that went hack to her early days in her life. She was an aggressive person and went after things hard and fast. When she came into this problem of confinement she kept getting hard and fast and showed the excitement and irritation, the depressed state from time to time.”
“ the court : Let me understand you. You found that she was mentally ill at the time?
the witness: Yes Sir.
the court : You disagree with the hospital diagnosis of schizophrenia?
the witness: This was a psychoneurosis.”
“the court: You say, ‘ mentally ill.’ What was your diagnosis with respect to her mental illness?
the witness: Psychoneurosis, anxiety depressive and a compulsive reaction, which is a condition, a very serious one, and in Miss Morgan’s case it went back years and years before. It was not a short-lived thing.”
“ Q. Did you find her to be psychotic? A. She was not psychotic.”
He further testified that he considered both Dr. Lanzkron and Dr. Feldman stationed at Matteawan Hospital to be qualified psychiatrists. That the records he examined disclosed that the claimant, shortly after admission, attended a staff examination at which point she was examined by four or five psychiatrists. That he considered this good procedure, but that it should be done more often. That he noted in the record the examinations by Dr. Feldman and Dr. Ivanov and a number of other doctors. That these were doctors who examined her directly, interviewed her and spent time with her on a person to person basis. That the diagnosis determined as a result of these examinations was schizophrenia, paranoid type and that this diagnosis was maintained throughout the entire hospitalization. That his opinion was that claimant was a neurotic and not psychotic. That both psychosis and neurosis were mental illness. That neurosis is considered a mental disorder. When asked if in his opinion the claimant had been properly handled by being hospitalized in Matteawan, he replied:
‘ ‘ A. The custodial part had to be handled that way, I suppose. The mental part of it should never have included a hospitalization at Matteawan. Now how to separate them, I don’t know.”
At the habeas corpus hearing before a jury in October of 1966 he gave the following testimony:
*986 “ Q. All right, now. Let me ask yon this question, Doctor. From your study of her hospital record and your psychiatric interview with her — of her — have you formed any opinion as to whether or not she is dangerous to herself or to Society in general? A. Yes.
Q. What is your opinion? A. 'She was highly dangerous to one man because of an episode years ago. The neurotic pinpoints the target. * * *. Having been handled properly, hospitalized, she no longer could be considered at all a menace to Society were she turned loose tomorrow. She would not go out and hit somebody with a knife, or anything at all. This whole operation of the last dozen years or so has been salutary to the neurosis, so that she would not go out, she would not go out and hit Dr. Weinstein with a knife, or whoever it was. She would not do that. This has been resolved now. If she had not been arrested and hospitalized and gone through this hospitalisation, but was left frustrated, she would still be a menace. This has removed that.” (Italics supplied.)
He further added:
“ the court : Your question is now addressed to the hospital. You felt that was salutary?
the witness: Any treatment, attention, is salutary, is necessary and helpful, any treatment paying attention to her. It happens she received this in the hospital. Had she not been sent to Matteawan, and I wish she had not, she would have had attention and treatment somewhere else, * * *. The diagnosis -was wrong.”
A review of the numerous exhibits, the attendants’ notes, the progress notes, and the medication sheet shows that claimant had been under a psychiatrist’s care daily. As indicated later in Dr. Lanzkron’s testimony, claimant was seen in daily rounds. The hospital record reflects approximately 10 written evaluations by Dr. Feldman. These evaluations concluded that she was a paranoid, her insight and judgment were defective, and she had delusions of persecution and grandeur. Dr. Schneider recorded two evaluations indicating she was hostile, verbally abusive, extremely paranoid and completely lacking in insight.
From 1961 until the claimant’s discharge in 1966, in addition to being seen by Dr. Lanzkron, the Assistant Medical Director, she was under the care of Doctors Ivanov and Srdar, psychiatrists, These doctors, in addition to others, saw claimant daily in their rounds and occasionally held interviews.
*987 The hospital record (Matteawan) contains approximately nine written evaluations by Doctors Ivanov and Srdar from 1961 to 1966. They show her insight and judgment were very defective, and she had delusions of persecutory character, and’ that she was hostile and that she was highly paranoid with delusions of persecution and grandeur ideas. At a special conference on May 17,1965 claimant was seen by Doctors Friedman, Peterson, and Lanzkron. She was found to be resentful, hostile and paranoid.
Bearing in mind the evaluations and reports of the above doctors who were the claimant’s treating psychiatrists and who were continually seeing her, we must consider the testimony given by claimant’s own expert psychiatric witness where he testified, among others things: “ If she had not been arrested and hospitalized and gone through this hospitalization, but was left frustrated, she would still be a menace. This has removed that.”
On behalf of the State, Dr. John Lanzkron, a qualified and experienced psychiatrist with many years of training and experience at Middletown State Hospital, became Assistant Director of Matteawan in January 1960. He personally examined claimant seven or eight times phychiatrically from May 22, 1961 to September 6,1966 when she left. That based upon his examinations and the clinical records, ward notes and all the progress notes of Matteawan Hospital, as well as the clinical summary of Harlem Valley Hospital and the Creedmoor Hospital, it was his opinion that she was suffering from a mental illness; schizophrenia — paranoid type during the stay in Matteawan Hospital. That she was psychotic.
“ Q. Doctor, will you tell us the onset of Miss Morgan’s mental illness ?
A. I would say that the first mental breakdown occurred in 1947, when patient made a determined — as she said herself'— a determined effort, suicidal effort. * * *. * * * due to an unhappy love affair and to an unsuccessful artistical career. This led to deep frustrations of the patient. The frustration led to anger and hostility. * * *. She started suing not only the doctors, she started suing the authorities of New York State for alleged damage she had suffered. In 1947 patient started to see a psychiatrist * * *. In spite of her treatment patient soon became overtly psychotic. According to the record she walked around for a year with a carving knife * * * and finally in 1957 she stabbed a man she mistook for Judge Weinfeld, who had dismissed her suit, who had dismissed a million dollar damage suit against the State.”
*988 He further testified that ‘ ‘ she felt, and she expressed it many times, that she was a political captive, a victim of a vendetta. And as she stated in writing and told us, she was a victim of the ■massive conspiracy of a group of politicians in and out of office who put her to Matteawan only to prevent her from continuing her legal action against the State of New York. In reality, the patient was committed to Matteawan after she was arrested for felonious assault and two doctors testified that she was mentally sick.” That she exhibited assaultive and abusive tendencies and made suicidal attempts. The Matteawan records indicate that claimant had been seen by eight psychiatrists.
On June 28, 1958 claimant was seen by Dr. Frank B. Glasser, Acting Medical Inspector from the Mental Hygiene Department. On October 8, 1962 she was examined by Dr. Richard W. Foster, Assistant Commissioner, Department of Mental Hygiene. She was not recommended for care in a civil institution. This was after being recommended for examination and evaluation by the Department of Mental Hygiene for possible transfer to a civil institution under their jurisdiction. Again, following letters from the claimant, she was interviewed and examined on May 13, 1963 by Dr. Richard W. Foster, Assistant Commissioner of Mental Hygiene; and again on July 18, 1966 claimant was examined by Dr. Arthur M. Sullivan, Assistant Director of Harlem Valley Hospital, who had been sent by the Department of Mental Hygiene to evaluate patients and determine if they could be transferred to a civil institution under the jurisdiction of the Department of Mental Hygiene. He found and reported: “ This woman continues to be paranoid, hostile, unpredictable, and she is not suitable for transfer to a civil State institution.”
On cross-examination Dr. Lanzlcron testified that rounds were made twice a day either by her psychiatrists or some other doctor. It was his opinion that when he saw her last on October 22, 1966 she was unable to understand the charges brought against her.
Thus we are faced with the expert opinion of Dr. Cattanach, the qualified psychiatrist who saw and interrogated the claimant for the purpose of testifying at a habeas corpus proceeding brought in her behalf in October, 1966 as opposed to the expert opinion of Dr. Lanzkron and the reports and findings of the other psychiatrists who were seeing, treating, and evaluating her throughout her stay at Matteawan, and the medical experts from the 'State Mental Hygiene Department who were seeing and examining her to determine her possible transfer to a civil hospital. We must come to the conclusion that claimant *989 was not an abandoned or forgotten patient. On the contrary it appears clear that her many complaints, of various kinds, were heard, documented and in many instances treated by prescribed medication and drugs. I find no evidence of failure of proper diagnosis or treatment of her mental or physical condition. If all the psychiatrists and physicians were wrong in their diagnosis, which I cannot accept, the State nevertheless would not be responsible for errors in medical judgment (St. George v. State of New York, 283 App. Div. 245, affd. 308 N. Y. 681; Dennison v. State of New York, 28 A D 2d 608, affd. 23 N Y 2d 996). This leads to the inevitable conclusion that claimant was not illegally detained at Matteawan Hospital.
On behalf of the claimant it has been contended that inadequate medical care and treatment caused aggravation of an injury to her esophagus when her stomach was lavaged at Roosevelt Hospital on February 3,1947 in an attempt to aspirate the barbiturates she had taken in a suicide attempt. This was some 11 years before admission to Matteawan Hospital. There is evidence in the ‘ ‘ medication chart and black book ’ ’ that claimant received many varied medications. The notes indicate she took vitamins the entire time she was at the hospital, mineral oil on numerous occasions, and a prescription given for aspirin whenever she wanted them. She was evidently on a bland diet for we note on 2/4/58 “ soft diet, patient will have blood sugar order. Dr. Feldman”. On February 17, 1958: “Patient had chest x-ray today ”; on March 4, 1958: “ Patient drank eggnog and took her medication ”; on March 18, 1958: 1 ‘ Patient drank her eggnog”; on March 19, 1958: “Patient ate full meal of special diet, took her rx medication ’ ’. Again on March 20, 1958 “ patient ate full supper (spec, diet) took rx med.”. This continued with interruptions of patient’s complaints and behavior. The more than 500 attendant’s notes indicate the care and treatment given to her by the doctors and attendants. The claimant had been placed on a special diet and she refused a G-. I. series when one was ordered. I fail to find any evidence of medical neglect or aggravation of her previous condition. There was no showing that her treatment at New York University Hospital, following her discharge from Matteawan, changed her physical condition. On the contrary, upon discharge from treatment it was unchanged.
The final and most vexing and troublesome problem for this court is the determination of the necessity for the periods of time that claimant was placed in various types of restraining devices and the methods used in connection therewith. It is most tragic to be incarcerated in an institution such as Matteawan *990 for nine long years, but although such incarceration is necessary, unnecessary punishment and cruelty, if proven, cannot be ignored or disregarded and would be appropriately considered malpractice. (Hammer v. Rosen, 7 N Y 2d 376; People v. Gersewitz, 294 N. Y. 163; People ex rel Saia v. Martin, 289 N. Y. 471.)
Claimant, a woman now 69 years old, described the following acts of assaults upon' her, which have not been materially challenged by any witness from Matteawan Hospital. One witness was produced, Mrs. Nancy Ferrone, a correctional hospital officer at Matteawan, and her testimony shall be discussed later.
(1) On April 1, 1958 they tied her down in a “ spread eagle fashion ” to the cot; her ankles were tied together with a strong strip and tied her to the bars at the foot of the bed and her arms at the side. She said she remained in that position for two weeks, tied down in that cot continuously, and tube fed. That during this entire time she was not loosened and they did not even bring her a bed pan. It sounds incredible, but not only was no witness called to refute it, but examination of the hospital “black book” discloses that on March 29, 1958 “ necessary to place patient back in camisole ”. No further comment appears about the camisole until April 2,1958 with the following, “ patient tube fed ordered up in soft camisole during day”. On April 6, 1958 “patient complaining that right arm and shoulder is sore and painful ”; on April 7, 1958 “ patient to remain in camisole ”; on April 8, 1958 “ Up in camisole. Quiet ”; on April 11, 1958 “ Camisole discontinued order Dr. Feldman”. Thus we have it recorded in the hospital ‘1 black book ’ ’ that she was in restraint 13 days, described by claimant as above, and described in the hospital records as 1 ‘ camisole ’ ’.
(2) In May, 1958 she was tied down to the cot in a straightjacket and was left that way for 10 days continuously, and not released at night, and without any bathroom privileges. The same “black book” discloses an incident with hospital attendant, Ferrone, on May 4, 1958 and we find ‘ ‘ patient put in protective sheet ’ ’. On May 14, 1958, we find the following note ‘ ‘ protection sheet discontinued ’ \ Thus we have the confirmation of the time as given by the claimant, 10 days, and the description by claimant of the type of restraint and that as given in the hospital records, “ protection sheet ”.
(3) In January, 1959 after addressing a letter to Mrs. Dorothy Schiffi, of the New York Post, seven or eight attendants removed her glasses, marched her through the day room to the end cell where she was locked in. She protested by banging on the *991 wooden door, a solid door with only a slit in it, and her shoes against the wall. Then the attendants took oft all her clothing except a little shirt, put her in a straight jacket, a heavy canvas sheet with buckles, and tied her down on a cot with strips of canvas, with a heavy canvas sheet over the straight jacket, the strip tying her down from the chest to her legs so she could not move her arms and legs and she was kept in that position for two and a half days without bathroom privileges. The ‘1 black book” records on January 6, 1959 “Banging on door and slamming bed up and down — ordered put in protection sheet”; on January 8, 1959 “taken out of restraint by Dr. Feldman. Patient to be in camisole for a couple of days ”; and on January 12, 1959 “ taken out of camisole ”.
(4) On May 2, 1962 in connection with the episode with Hospital Attendant Lyons, who could not appear in court because of illness, claimant avers that attendant Barbara Lyons hurtled her a considerable distance, punched her causing her a sprained right ankle, bruises on her right arm and injuries to her right hip. Eight or nine attendants came to her cell with a straight jacket and placed her in restraint for three and a half days. Nothing was done about her left ankle, arm or hip.
On May 2, 1962 the ‘ ‘ black book ’ ’ states: ‘ ‘ necessary to place patient in camisole ’ \ On May 3,1962: “ to remain in camisole ’ ’; on May 4, 1962: ‘ ‘ patient camisole discontinued per Dr. Ivanov ”,
In addition to the above straight jacket incidents, claimant was locked in her cell six times during her stay at Matteawan.
(5) She states that in July or August, 1963 she was “ locked in ’ ’ for the fifth time. Following an argument eight or ten attendants came, took her glasses, one of them “ Devon ” struck her hips, sprained both feet when they pushed her into a cell in Ward “ 11 ”. She was sobbing because of pain and Dr. Srdar ordered bandages for both of her feet. For some time her entire right side was in pain and tremor. They told her the tremor was due to a little stroke.
The ‘ ‘ black book ’ ’ records on August 14, 1963 ‘ ‘ Patient ordered in bed — leg elevated. Epsom salts compresses to right foot per Dr. Srdar”; on August 15, 1963 x ray revealed ‘no fracture — to continue epsom salts compresses and keep foot elevated per Dr. Srdar; and on August 16, 1963 ‘ ‘ patient to receive epsom salts for 1 hr. tid ”. This would appear to confirm claimant’s story of the fifth ‘ ‘ lock in ”, The “ black book ” reports on May 15, 1964 ‘ ‘ patient locked in room upon returning from dining room.”; on May 20, 1964 “ Patient confined to *992 room ” on May 22,1964 “ Patient ont on ward per Dr. Ivanov ”. Patient describes this ‘ ‘ lock in ” as follows:
She was in solitary, she could not lie down in her cell all day; she could not make up her cot to lie in, or have her eyeglasses or reading matter; she could not wash and her toilet needs remained in the cell with her; she lay on the stone floor during the day and was only allowed on the cot at night.
Attempting to explain the use of restraining jackets or other measures of restraint on one occasion, the State produced. Mrs. Nancy Ferrone, 53 years old, a high school graduate, married and the mother of two children. She was employed at Matteawan Hospital as a correctional hospital officer from 1937 to 1942 and from 1952 to date. She knew the claimant and contended that on May 4, 1958 she was senior attendant on the claimant’s ward and while looking for headache pills in claimant’s room, she was attacked by her from the rear. Claimant, she says, was furious because Mrs. Ferrone had found some pills in a box in the room. They struggled until help came. Her arm and face was scratched and injured. Claimant received a bruise over her right eye during the struggle. This was the incident that put claimant in the restraint described by her for 10 days. Not a word from this witness to contradict the claimant’s testimony about the assaults upon her, and the types of restraints used upon her.
Other than Mrs. Ferrone and her testimony that Barbara Lyons, the hospital attendant involved with the incident that claimant has described, none of the other attendants, and there were many, or the doctors, were produced to testify at the trial. The failure of the State to call these employees as witnesses warrants the inference that their testimony would not have substantially contradicted the testimony of the claimant. (See Noce v. Kaufman, 2 N Y 2d 347, 353; Laffin v. Ryan, 4 A D 2d 21, 26, 27.) To add to the inference that may be drawn by this court, the testimony of the claimant is buttressed by the records of the hospital and the “ black book ” referred to as claimant’s Exhibit 34.
It is the position of the State that the camisoles and the restraints used were necessary because of threats of suicide and attempts by claimant to starve herself. We cannot accept this, particularly in the absence of physicians and witnesses to so state. On the contrary we find that claimant could have, if necessary, been treated and calmed by the drugs available to them. The ‘1 black book ” shows the use of thorazine on many occasions. Certainly there was available to them various tranquilizers and *993 anti-depressants which could he administered orally or by injection. These could easily have restrained this ailing lady in her sixties. Witness the testimony of Dr. John Lanzkron, the Assistant Medical Director of the hospital:
“ the witness: Yes. According to the note — I have to read the whole note; then it’s clear. ‘ Patient refused meals and medication. ’ So that off the record when the medication is refused and patient is dangerous for himself or others it means suicidal or homicidal; we have to give it by injection. We force the patient to take medication. Thorazine was given, hypo with a needle.
the covet: Liquid Thorazine?
the witness: Yes, at 7:00 a.m.” (Italics supplied.)
It is apparent that the kind of restraints used upon claimant were for punishment, and punishment was not to be practiced. Dr. Lanzkron testified:
“ Q. Doctor, did they have any punishment procedures at Matteawan? A. I never heard about punishment. The word 1 punishment ’ doesnt exist in a hospital. ”
Nevertheless, only Doctors Srdar, Feldman, or Ivanov, or any of the other attending doctors could give some explanation. They did not appear to testify.
It has been said that the plain spoken word is easily understood and potent. Speaking plainly I find that the claimant was subjected to an imposition of such cruel and unusual punishments as to constitute assaults upon her. They were unnecessary and in these instances only caused additional pain, suffering, and anguish. I fail to find any contributory negligence on the part of the claimant.
The damages we find and award to the claimant in this case are to compensate her for personal injuries, including the pain and suffering which naturally flow from the assaults, to wit, the restraints used upon her, wrongfully, and negligently, and from the beatings inflicted upon her. With respect to this cause of action, the defendant’s motion to dismiss, upon which the court reserved decision, is now denied, and we award the sum of $15,000 to the claimant.
With respect to all other causes of action, the claimant has failed to sustain the burden of proof and the defendant’s motions to dismiss these, upon which the court reserved decision, are now granted.