## Court of Appeals.

*February*, 1891.

## PEOPLE *v.* McELVAINE.

*Insanity—examination of defendant as to sanity—pleading—Code Crim. Proc.* §§ *336 and* 658.

Where upon the whole case it appears upon a criminal trial that defendant had sufficient intelligence and self control to understand the nature and character of the act committed by him and to refrain from its commission if found to be inconsistent with a due regard for his own safety or interest, defendant had sufficient mental capacity to make him legally responsible for his acts.

It is only when the necessity of an examination as to the sanity of a prisoner is sufficiently made to appear to the court in which the indictment is pending that it is bound to order an examination ; but it would be the plain duty of a court when the subject is brought to its attention by responsible parties, to make itself a

sufficient inspection and examination to determine whether the application is made in good faith and upon plausible grounds; and the apparent facts thus discovered are made the condition of the right of the court to institute the statutory inquisition.

The statute (*Code Crim. Proc.* § 658) contemplates two cases in which a commission may be appointed to inquire into the sanity of a prisoner: First, after a plea on the merits and before trial, to determine his mental condition at the time of the commission of the crime; and Second, when a person in confinement under indictment whether before or after conviction appears to be insane, to determine his mental condition at the time of the examination.

The trial court is invested with a discretion to order such an examination or not as it may from inspection, observation, and information judge to be necessary or expedient.

Appeal from a judgment entered in the court of oyer and terminer of Kings county, upon the verdict of a jury convicting the defendant of murder in the first degree.

The opinion of the court of appeals upon a prior appeal is given at page 149 of this volume.

The facts sufficiently appear in the opinion of the court.

*George M. Curtis*, for defendant appellant.

*James W. Ridgway* (district attorney), *John F. Clarke*, (assistant), for the people, respondent.

RUGER, C. J.—Upon a former appeal by the defendant in this case from a conviction of murder in the first degree this court ordered a new trial upon the ground that an error had been committed in allowing an expert witness for the people to answer an improperly framed hypothetical question relating to the sanity of the defendant (People *v.* McElvaine, 121 *N. Y.* 250 ; 8 *N. Y. Crim. Rep.* 149.) The defendant has again been tried upon the indictment, and the jury have again found him guilty of the crime charged, and from the judgment rendered upon that con-

viction this appeal is taken.   No question is made but that
the defendant killed one Luca, by repeatedly stabbing him
with a knife in his back, breast, and arms, while he was in
the act of resisting the attempts of the defendant to escape
from the house, which he had burglariously entered.   The
undisputed evidence showed that Luca was a grocer, living
at the corner of Jay and High Streets in the city of Brook-
lyn, and occupied the first floor of the building as a grocery
store and the upper rooms for a dwelling-house for himself
and family, consisting of a wife, three children, a servant
girl, and two clerks.   There is no direct evidence that any
one was associated with defendant in the commission of the
crime, and the proof shows him, when first discovered, en-
gaged in a struggle with Luca, about 3 o'clock in the
morning of August 22, 1889, in the back room of the
second story of Luca's house.   This discovery was made by
Mrs. Luca and the servant, and upon their seizing him he
said : " I have stabbed him, and if you don't let go of me I
will stab you."   Thereupon they let him go.   Luca was
then sinking to the floor from his wounds, four of which
were mortal, and soon after expired.   When released the
defendant passed through the window to a ladder extend-
ing to the ground, and descended to the back yard, and
from there escaped over a fence into High Street.   When
in the act of putting on his shoes, which he had removed
from his feet in preparation for the burglary, he was ar-
rested by the police.   Being taken thus red-handed he ap-
peared conscious of the uselessness of an attempt to deny
his guilt, and, being asked why he did it, said : " He was a
big blokie, and I had to do something to get the best of
him."   It was obvious that the defendant entered the house
by getting over the fence into the back yard, and there,
removing his shoes, took a ladder found on the premises,
and which was customarily kept hanging against the side
of the house, placed it against the second-story window, and
by ascending it, and removing a wire screen from the win-
dow, obtained easy access to the room where the homicide

was committed. He had evidently been interrupted in his design of robbing the house by the intervention of Luca, and, upon being discovered, was attempting to escape from the premises.

No defence to this array of proof afforded any reasonable prospect of success, except that growing out of the alleged irresponsibility of the defendant by reason of insanity, and this was set up on the trial as the sole ground of defence. It is now a fundamental principle in all civilized countries that this defence, when established, shall furnish to the accused not only a protection against conviction for crime, but a sufficient reason why he should not be tried or sentenced, or, if tried and convicted, why the judgment of the court should not be executed; and this rule has for a long time been a part of the statutory law of this state Section 20, (*Penal Code* 2 *Rev. St.* p. 697, § 2). These statutes express a humane principle, and the law-makers of the state have, by numerous provisions, so guarded the rights of such persons that they cannot be lawfully punished for an act which was committed by them while in a state of insanity, or when they have become insane during or after a trial or conviction (Sections 336, 481, 658, *Code Crim. Proc.*) It is the duty, as it should always be the inclination, of courts to give effect to these provisions of law, and, so far as human judgment and intelligence can determine, to see to it that no person is punished for an act done while he was mentally incapable of distinguishing the character of such act, or is incompetent to understand and appreciate the cause and object of his punishment. Feeling the obligation of this duty, and impressed by the learning and zeal of the defendant's counsel with the disposition to take the most favorable view of the case for the appellant that the evidence would authorize, we have carefully read and reviewed the case with the hope of finding some evidence which would support the conclusion that there was doubt as to the correctness of the verdict of the jury; but we have been unable to find any sufficient confirmation of the theory, so

strongly asserted by his counsel, that the jury erred in their findings upon the questions presented to them.   The points most strenuously urged upon us for a reversal of the judgment are the refusal of the trial court to institute a preliminary inquiry relative to the defendant's present sanity, and the claim that the undisputed evidence established the fact of insanity at the time of the commission of the offence so conclusively that the court should reverse the judgment as matter of law.   The case does not, in its material features, differ from that which it presented on the former appeal, except in respect to the omission of the errors then appearing in the record, and the absence of expert evidence on the part of the people on the subject of the defendant's sanity when the crime was committed.   Upon the last trial no medical experts were called on the question of sanity on behalf of the people ; but, by the consent of the people's counsel, the evidence of two experts called on behalf of the defendant was, on account of their non-attendance, permitted to be read from the minutes of the former trial.   A careful consideration of the evidence of these experts must lead any impartial mind, we think, to the conclusion that they were both of the opinion that the defendant did, when he stabbed Luca, know the nature and quality of the act he was committing, and did know that it was wrong. The general effect of their evidence was to impress the mind with the conviction that, according to the statutory definition of sanity, the defendant was guilty of knowingly committing the crime with which he was charged.   The witnesses expressed or suggested their dissatisfaction with the statutory definition of sanity, and seemed to think that it would be better to substitute therefor what was called the " medical opinion of his mental condition."   But it seems to us quite unnecessary, under the circumstances of this case, to go into a critical examination or discussion of the various phases of insanity, as exhibited and illustrated in the discussions of legal and scientific writers; as on the whole case it seems quite clear to us that the defendant had

sufficient intelligence and self-control to understand the nature and character of the act committed by him, and to refrain from its commission if found to be inconsistent with a due regard for his own safety or interest. The evidence showed that previous to his fourteenth year he had been to school, and, although a dull and slow scholar, had acquired the ability to read and write and do sums in arithmetic. After that time, his family being in humble circumstances, he was accustomed to labor for a livelihood in such menial employment in his neighborhood as he could obtain and was capable of pursuing. He was 19 years of age when the crime was committed, and for several years previous to that time had been engaged in the delivery of ice to customers for some dealer in that article in Brooklyn, and other similar employments. He was not a person of much intelligence or a high grade of morals, and was unsteady and irregular in his habits. He had never, apparently, been treated by his family as of unsound mind, or confined as a lunatic, but had been brought up and dealt with like other boys of his age and condition in life. A few months before this homicide he had been prosecuted by his sister for stealing money from her, and was condemned to imprisonment as a punishment for that crime. This prosecution had been undertaken with the apparent acquiescence and consent of his relatives. His mental condition did not then seem, in their judgment, to be a sufficient reason for relieving him from responsibility for his acts. He was married about 11 days before he killed Luca, and was then living with his wife, within a block and a half of Luca's house. He stated, in reference to the crime, that the day before it was committed he was going by Luca's house with a comrade, who suggested to him that "that would be a good house to do;" to which the defendant replied, "All right." The evidence tends to show a deliberate adoption by the defendant of a plan to rob Luca's house, and the acquisition of sufficient knowledge of the premises and their surroundings to enable him to commit

the crime. The exhibition of presence of mind when dis-covered in the perpetration of the burglary, and the prompt adoption of the means thought necessary by him to insure his safety, a coolness and deliberation in making use of them and freeing himself from the interference of those who came to Luca's aid, are utterly inconsistent with the idea that he was not acting under the influence of intelligence, reason, judgment, and a full appreciation of the hazard, character, and consequences of the act he was engaged in performing. When seized by Luca there was no hesitation in the employment of the means he had prepared to over-come resistance, and when interfered with by Luca's wife and servant, he promptly adopted the most efficient meas-ures to rid himself of their opposition, and avail himself of the opportunity thus afforded to escape. When we regard the cunning and sagacity displayed by him in laying plans and making preparation for the commission of the crime, the promptitude and courage manifested in using the weapon with which he was armed, and the skill exhibited in effecting his escape, we are not disposed to find fault with the jury, or to say that they had not ample evidence to sustain the verdict rendered by them.

The evidence given on behalf of the defendant to sus-tain the claim of insanity was furnished almost wholly by relatives who were naturally interested in giving the most favorable version for the defendant of the history of his life, and it seems to us to exhibit a disposition to magnify incidents occurring to the defendant in his childhood, which were supposed to bear on the question of his sanity, but which seem to us to be similar in character to those usually accompanying the life of a boy of defendant's age, acquire-ments, and position in life. It was, under the circum-stances, a clear case for the jury to determine the weight which should be accorded to this evidence, and we are not disposed to interfere with the disposition they have made of it on its merits. The defendant also claims that we should reverse the judgment because the trial court did not

order a preliminary examination, by commission or otherwise, to inquire into the present sanity of the defendant. This claim is founded on the provisions of section 658 of the Code of Criminal Procedure, which provides that " when a defendant pleads insanity, as prescribed in section 336, the court in which the indictment is pending, instead of proceeding with the trial of the indictment, may appoint a commissson of not more than three disinterested persons, to examine him, and report to the court as to his sanity at the time of the commission of the crime. If a defendant in confinement under indictment appears to be at any time, before or after conviction, insane, the court in which the indictment is pending, unless the defendant is under sentence of death, may appoint a like commission to examine him, and report to the court as to his sanity at the time of the examination. . . . The commission must summarily proceed to make the examination. . . . They must be attended by the district attorney of the county, and may call and examine witnesses, and compel their attendance. The counsel of the defendant may take part in the proceedings. When the commission have concluded their examination they must forthwith report the facts to the court, with their opinion thereon." Section 336 provides: " Whenever a person in confinement under indictment desires to offer a plea of insanity, he may present such plea at the time of his arraignment as a specification under the plea of not guilty." At the commencement of the last trial the defendant's counsel requested that the defendant should be arraigned for the purpose of affording him an opportunity to plead to the indictment. The court decided that this was unnecessary, as he had been once arraigned, and had pleaded not guilty to the indictment. The defendant excepted to this decision. We think this exception was untenable. The fact that a new trial had been ordered did not affect the validity or effect of the former plea, that stood as the statement of the defendant's defence until it was permitted to be withdrawn, or otherwise disposed of by the court. There

is no provision in the statutes for a plea of insanity, except that authorized by section 336, to be made upon arraignment. The defendant's counsel then tendered an oral plea of not guilty on behalf of the accused, and, as a specification under that plea, stated that "the prisoner, Charles McElvaine, is now in a state of idiocy, imbecility, lunacy, or insanity, and is incapable of understanding this proceeding, or of making his defence, or of instructing his counsel as to his defence, if he has one." The counsel also requested the court to appoint a commission under section 658 of the Code of Criminal Procedure, to examine and report on the question of the present sanity of the defendant. The court denied the motion, upon the ground that there was nothing in the case from which it appeared to him that the defendant was then insane or imbecile. The defendant excepted. We do not think that this exception was well taken. The statute is very clear and unambiguous, and seems to invest the trial judge with a discretion to appoint a commission or not, as in the exercise of his judgment he may deem it proper or necessary to do.

The statute seems to contemplate two cases in which a commission may be appointed : (1) after a plea on the merits, and before trial, to determine his mental condition at the time of the commission of the crime ; and (2) when a person in confinement under indictment, whether before or after conviction, appears to be insane, to determine his mental condition at the time of the examination. That the exercise of the powers thus conferred is discretionary seems to be confirmed by a consideration of the history of legislation on the subject. By section 2, tit. 7, c. 1, pt. 4, Rev. St., it was provided that "no act done by a person in a state of insanity can be punished as an offence, and no insane person can be tried, sentenced to any punishment, or punished for any crime or offence, while he continued in that state." The method by which this provision of the statute was to be made effective was not, so far as I can discover, defined by statute, until the enactment of section 32,

c. 135, of the Laws of 1842, entitled "An act to organize the state lunatic asylum," etc., whereby it was provided : "If any person in confinement under indictment or under sentence of imprisonment, or under a criminal charge, . . . shall appear to be insane, the first judge of the county where he is confined . . . shall institute a careful investigation . . . by jury or otherwise ; . . . and, if it be satisfactorily proved that he is insane, said judge may discharge him from imprisonment, and order his safe custody and removal to the asylum." In 1847 chapter 328 was enacted, by which it was provided : "If after any convict shall have been sentenced to the punishment of death he shall become insane, the sheriff of any county, with the concurrence of the justice of the supreme court, or, if he be absent from the county, with the concurrence of the county judge of the county in which the conviction was had, may summon a jury of twelve electors, to inquire into such insanity, and shall give immediate notice thereof to the district attorney of the county." Upon a revision and codification of the statutes relating to the insane, effected by chapter 446, Laws 1874, it was provided by section 20, art. 2, tit. 1 of that act, that "if any person in confinement under indictment for the crime of arson, murder, or attempt at murder, or highway robbery, shall appear to be insane, the court of oyer and terminer in which such indictment is pending shall have power, with the concurrence of the presiding judge of such court, summarily to inquire into the sanity of such person, . . . and for that purpose may appoint a commission to examine such person and inquire into the facts of his case, and report to the court," etc. Section 22 provides that "if any person in confinement under indictment for the crime of arson, or murder, or attempt at murder, shall appear to be insane, the county judge of the county where he is confined shall institute a careful investigation, call two or more reputable physicians and other credible witnesses, invite the district attorney to aid in the examination, and, if it be deemed necessary, call a jury ; . . . and, if

it is satisfactorily proved that such person is insane, said judge may discharge such person from imprisonment, and order his safe custody and removal to one of the state lunatic asylums," etc. Section 26 is a substantial re-enactment of section 32 of the act of 1842. Section 30 reads as follows : " Whenever any person in confinement under indictment for the crime of arson, murder, or attempt at murder, or highway robbery, desires to offer the plea of insanity as a general traverse and his whole defence to such indictment, he shall present such plea at the time of his arraignment, and at no other stage of the trial but this shall such plea be received or entertained by the court ; and the court before whom such trial is pending shall have power, with the concurrence of the presiding judge thereof, to appoint a commission to examine such person, . . . and to inquire and report to the court aforesaid upon the fact of his mental sanity at the date of the offence with which he stands charged," etc. Section 2, tit. 11 : " All laws or parts of laws inconsistent with or repugnant to the provisions of this act are hereby repealed." This act continued in force until the enactment of the Code of Criminal Procedure.

It is quite obvious from the reading of these acts that it was contemplated that any proceedings under them should be originated by the sheriff, the county judge, or the court of oyer and terminer ; and under the provisions of the law prohibiting the trial, conviction, or punishment of insane persons, it was the duty of such officers to see to it that the law was not violated. It would undoubtedly be competent for a prisoner or his counsel to call the attention of the judge or other officer charged with the duty of seeing that a prisoner was not illegally punished to his mental condition, and make it appear to them, if possible, that he was insane ; but the question as to whether any special examination should be had was undoubtedly left to the discretion and judgment of those officers who were charged with the duty of making such examination. We do not think the Code of Criminal Procedure has made any radical change

in the mode of procedure or the character of the proceedings. The duty of making the examination referred to is now imposed upon the court before whom the indictment is pending, and it would be responsible for any violation of the law in respect to trying or punishing insane criminals permitted by it. It is only when the necessity of such an examination is sufficiently made to appear to the court in which the indictment is pending that it is bound to order an examination ; but it would be the plain duty of a court, when the subject is brought to its attention by responsible parties, to itself make a sufficient inspection and examination to determine whether the application is made in good faith and upon plausible grounds, and the apparent facts thus discovered are made the condition of the right of the court to institute the statutory inquisition. Such an examination, we infer, the court made in this case. It had previously tried the defendant for the same crime, and had heard the evidence adduced by the defendant to support the plea of insanity. It was familiar with the appearance and conduct of the prisoner during the period of that trial, and had sufficient grounds before it to judge as to the probability of his present sanity. It then had the prisoner before it, and witnessed his actions and manner, and had access to the information acquired by the officers of the court through their daily contact and communication with the defendant during the time of his imprisonment; and it is hardly possible that the defendant could have manifested symptoms of insanity during his confinement which would not have been discovered by or communicated to the court. There was no pretense that there had been any change in his mental condition since the previous trial, and no proof of any insanity whatever was given to support the demand for an inquisition. We think the motion rested in the discretion of the court, and it was justified in denying it. It is certainly a startling proposition to think that a prisoner can, at his pleasure, arrest the regular and orderly administration of criminal law by raising collateral issues indefi-

nitely, and thus delay, and perhaps defeat, a trial under an indictment. The law has made ample provision for the protection of all a prisoner's rights, but it does not put it in his power to paralyze the administration of justice. The question of his sanity at the time of the commission of the offence is always open for trial under a plea of not guilty, and we have referred to the provisions which protect him from trial, conviction, or punishment, if he becomes insane while in confinement. So far from having a right to compel an examination into the question of present insanity, he is permitted to take part in such examination, if ordered, only by the express provisions of the statute. It is plainly inferable from this permission that it was supposed without it the examination must be conducted by the officers charged with the duty of making it alone. The question, raised under similar statutes, has been considered in a number of our sister states, and, so far as we are aware, has been uniformly construed to invest the trial-court with a discretion to order such examination or not, as it might, from inspection, observation, and information, judge to be necessary or expedient (Webber *v.* Commonwealth, 119 *Pa. St.* 223 ; Jones *v.* State, 13 *Ala.* 153 ; Bonds *v.* State, 1 *Mart. & Y.* 142 ; State *v.* Arnold, 12 *Iowa*, 480 ; People *v.* Ah Ying, 42 *Cal.* 18). Upon the whole case, we are of the opinion that no error was committed by the trial-court, or that sufficient reason exists to authorize us to reverse the judgment of the court below.

The judgment is affirmed.

All concur.