THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* LEWIS WOLFE, Defendant.

County Court, Kings County, October 14, 1950.

414

*Nicholas Pecora* and *Herbert E. Walters* for defendant.

`  *Miles F. McDonald, District Attorney (William I. Siegel* of counsel), for plaintiff.

GOLDSTEIN, J. The defendant is awaiting execution of a sentence of death at Sing Sing Prison, having been convicted of murder in the first degree. He now makes application for a new trial based on the grounds of newly discovered evidence.

This case has been pending before the court since January 3, 1944, on which date Lewis Wolfe was indicted by a Grand Jury of this county for the crime of murder in the first degree. The indictment is predicated on a complaint that on or about December 29, 1943, the defendant willfully, feloniously and of malice aforethought struck and killed his wife, Paula Mona

Wolfe. The history of the case has many ramifications and is unique in the annals of criminal jurisprudence. It has presented many vexing problems, not the least of which has been the passage of lengthy intervals of time, first between indictment and trial and later between the conviction and the imposition of sentence. In all more than six years have elapsed since the defendant was indicted. During that period two of the persons who were associated with the case as counsel for the defendant have been removed from it — one (former District Attorney Joab H. Banton) by death and the other (Attorney Philip Warren) by severe illness which has required continuing hospitalization. Because of these unfortunate circumstances, the court has had to forego the services of two of the persons. After the death of Mr. Banton the court appointed Attorney Herbert E. Walters to assist the remaining counsel, Mr. Nicholas Pecora, in the defense.

Another problem has been that of the relationship between the defendant and the various lawyers who have defended him, and specifically his inability or refusal to follow the advice of these gentlemen. The record discloses that the defendant discharged his first attorney, Hyman Barshay, Esq., a noted attorney, because the latter was of the opinion that a defense of insanity should be interposed. In retaining his present attorney, Mr. Nicholas Pecora, the defendant expressly enjoined Mr. Pecora from interposing a defense of insanity. Such were the circumstances under which the defendant was brought to trial before this court and a jury on October 18, 1944, more than nine months after the indictment was returned. The trial continued until November 1, 1944, on which date the jury found the defendant guilty of murder in the first degree, as charged, without recommendation.

The fact that the defendant's capacity to understand the nature of the charge against him and to make his defense, was not made an issue in the case until after the jury had rendered its verdict, is perhaps the most vexing of all the problems in the case. The subsequent efforts to clarify by clinical observation and by the expert testimony of various psychiatrists, the mental condition of the defendant at the time of his trial, have added tremendously to the voluminous record already made in the case. The minutes of the trial and the minutes of the several subsequent hearings have now produced some 5,000 pages of testimony and this is exclusive of the increment to the total record created by the lengthy moving papers and responses that

have been prepared in the different motions and applications presented to the court.

The court has carefully scrutinized the entire record in considering the present application. Recapitulated as briefly as possible, the record discloses the following developments in the case subsequent to the jury's verdict:

On or about November 8, 1944, Philip Warren, Esq., as one of the attorneys for the defendant, presented a petition to this court requesting that all proceedings be stayed and that the defendant be committed for mental examination. The court granted this application and entered an order pursuant to the provisions of section 658 of the Code of Criminal Procedure, committing the defendant to the division of psychiatry of Bellevue Hospital, to be examined as to his mental condition. Thereafter, the division of psychiatry of Bellevue Hospital submitted a report to the court dated December 5, 1944, containing the findings and conclusions of the examiners.

The report stated that the defendant was insane, suffering from a mental disorder, diagnosed as schizophrenia (dementia praecox) of the paranoid type; that he was incapable of understanding the charge and proceedings against him. It recommended commitment to the Matteawan State Hospital at Beacon, New York. This report was signed by S. Bernard Wortis, M.D., director of the psychiatric division, Morris Herman, M.D., assistant director and Benjamin Apfelberg, M.D., senior psychiatrist.

Thereafter, at a hearing held on December 8, 1944, the report was confirmed by the court and an order was made and entered pursuant to section 662-b of the Code of Criminal Procedure committing the defendant to the Matteawan State Hospital at Beacon, New York. Said order provided in part as follows: '' Ordered that the report of the Psychiatrists of Bellevue Hospital, dated December 5, 1944, that Lewis Wolfe is presently insane and incapable of understanding the charge and proceedings against him and of making his defense, be and the same hereby is confirmed, and the defendant be and he hereby is committed to the Matteawan State Hospital at Beacon, New York, until he shall no longer be in such state of idiocy, imbecility, or insanity, as to be incapable of understanding the charge and proceedings against him or of making his defense, when he shall be returned to this court for judgment upon the conviction herein.'' The defendant was committed to the Matteawan State Hospital, pursuant to the provisions of that order.

On February 9, 1950, Dr. John F. McNeill, M. D., Superintendent of the Matteawan State Hospital, certified to this court that the defendant was no longer in such a state of idiocy, imbecility, or insanity, as to be incapable of understanding the charge pending against him or making his defense thereto. On February 11, 1950, an order was made and entered directing and ordering the defendant's return from Matteawan to the Kings County Jail.

On February 15, 1950, and on subsequent dates thereafter, hearings were held to determine whether or not the court should confirm the report of the Matteawan authorities. The developments at the hearing produced the unusual situation wherein the doctors of the Matteawan State Hospital reversed their previous diagnosis as to the then mental condition of the defendant. At the commencement of the hearings to confirm the report, the District Attorney moved such confirmation. However, at the conclusion of the hearings, the District Attorney withdrew his motion to confirm the report, and when counsel for the defendant thereupon moved such confirmation, the District Attorney took no position either for or against such motion.

When the Matteawan authorities reversed their opinion as to the mental condition of the defendant, the court appointed two independent psychiatrists to aid the court in arriving at a just and proper conclusion. These were Drs. Louis Berg and Laurent Feinier. Subsequently at a hearing on March 15, 1950, these two psychiatrists testified that in their opinion the defendant was, at the particular time of their examination (March, 1950) capable of understanding the charge made against him and of making his defense thereto. They agreed, however, to the diagnosis made at Matteawan to the effect that the defendant had suffered a manic depressive psychosis. In substance, their conclusion was to the effect that the defendant had recovered sufficiently to enable him to understand his situation *vis-a-vis* the court, within the meaning of section 1120 of the Penal Law. What disagreement there was between the positive findings of Drs. Berg and Feinier and the negative findings of the Matteawan State Hospital psychiatrists as to the defendant Wolfe's mental condition in March, 1950, lay chiefly in their respective interpretations of the scope and significance of certain ideas of reference expressed by, or elicited from the defendant. All were agreed that there had been a severe psychotic episode and in this they also agreed with the findings of the psychiatrists of the Bellevue Hospital Psychiatric Divi-

sion, as previously put into the record in the report of December 5, 1944, and the formal hearing of December 8, 1944.

On March 18, 1950, after having carefully studied the testimony and the opinions of all the expert witnesses, the court rendered a lengthy written decision in which the entire case history was discussed with all its medical and legal and humanitarian problems. (*People* v. *Wolfe,* 198 Misc. 695.) The court decided that on all the evidence then before it, the report of the Matteawan authorities dated February 9, 1950, should be confirmed. This meant that the court after due deliberation found that the defendant was at that time and is at the present time not in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge against him or making his defense thereto. Thereafter, on March 20, 1950, the defendant was brought before the court and the death sentence was pronounced upon him, as is mandatory under the law.

On March 21, 1950, Nicholas Pecora, Esq., attorney for the defense, presented an affidavit and order to show cause praying for a new trial pursuant to the provisions of subdivision 7 of section 465 of the Code of Criminal Procedure on the ground of newly discovered evidence. The basis of the present application is that counsel for the defendant now urges upon the court that at the time the defendant was placed on trial and all during the trial (October 16th to November 1st, inclusive, 1944) he was in such a state of idiocy, imbecility, lunacy or insanity as to be incapable of understanding the proceedings or making his defense. This is the sole issue to be determined by the court on this application for a new trial.

If the contention of the defendant through his attorney is correct, justice would require a new trial be granted, and the court would have no alternative except to grant the petition for a new trial.

Let us examine the law insofar as criminal responsibility of an insane person is concerned and the law as to when and under what circumstances an insane person may be placed on trial.

The average layman and many members of the Bar are under the erroneous impression that an insane person is not responsible for the commission of a crime and that he may not be placed on trial. This condition exists because there is a distinction between medical insanity and legal insanity. However antiquated the statute laws with reference to insanity as a defense to criminality may be, the fact is that they do not exactly coincide with this widespread impression. The rule of law established in England by the decision of the judges in

*M'Naghten's Case* (10 Cl. & Fin. 200) is still the law of this State and is embodied today in section 1120 of our Penal Law. It is, therefore, binding upon the court.

Now what is the law of insanity? A clear distinction must be made between an insane person's responsibility for the commission of a crime, as distinguished from the conditions which, under the law, may preclude trial for such a crime. Section 1120 of the Penal Law commences with the statement that an act done by a person who is an idiot, imbecile, lunatic or insane is not a crime. It is from such verbiage that the layman is of the opinion that an insane person is not responsible for the commission of a crime. However, section 1120 of the Penal Law continues on to state that a person is not excused from criminal liability as an idiot, imbecile, lunatic, or insane person, except upon proof that, at the time of committing the alleged criminal act, he was laboring under such a defect of reason as not to know the nature and quality of the act he was doing; or not to know that the act was wrong. Thus the law of the State makes an insane person liable for the commission of a crime if at the time of the commission of the alleged criminal act he knew the nature and quality of the act he was doing or knew that the act was wrong. This is true notwithstanding the fact that he may be formally diagnosed as insane, according to medical standards. The determination of criminal responsibility is for the trial jury to make and becomes under our law a question of fact which is solely in the province of the jury and not of the court.

What is the law on the question as to when an insane person may be placed on trial? Under New York State law, a person cannot be tried, sentenced to any punishment or punished for a crime while he is in such a state of idiocy, imbecility, lunacy or insanity as to be incapable of understanding the proceeding or making his defense. This provision of law is likewise found in section 1120 of the Penal Law. Thus, the statute places a limitation upon the court and prohibits the trial or punishment of an insane person, unless he is capable of understanding the nature of the charge or of making his defense. The determination whether or not an insane person is capable of understanding the proceedings or making his defense rests upon the court and the full responsibility for deciding whether or not such person should be placed on trial or sentenced to any punishment or punished for a crime, is one that the court itself must assume. This is clearly the rule of law applicable to insanity as a defense to criminal responsibility.

In the light of all this and on the entire history of the case from its inception, the court has given the present application the most serious consideration. In resolving the factual issue whether or not this defendant should have been placed on trial in October, 1944, the court is required to apply legal, not medical tests.

Let us examine the record in this case. What does the record disclose? What is the testimony of the medical experts? While it is true that under our law, the court is not bound by the opinion of experts, the court should, nevertheless, take cognizance of and give great weight to the opinions of reputable medical experts who have testified both at the trial and at various hearings held in this case.

On December 8, 1944, as mentioned above, a hearing was held by this court pursuant to provisions of section 662-b of the Code of Criminal Procedure to determine whether or not the reports of the Bellevue Hospital dated December 5, 1944, should be confirmed. Dr. Benjamin Apfelberg, senior psychiatrist of Bellevue Hospital who was one of the experts who signed the report, testified. Dr. Apfelberg was called as a witness for the People. He testified that the defendant was then suffering from a mental disease known as dementia praecox. The record discloses the following testimony:

" The Court: What is Dementia Praecox, Doctor, and what causes it? The Witness: The causes are unknown. Dementia Praecox is a chronic progressive type of mental disease, often with a bad prognosis, and it is characterized by delusions, hallucinations; pathological emotional state.

" The Court: When did the symptoms of his disease begin to manifest themselves to you, when he was under your observation? The Witness: He came to Bellevue on the 13th of November, and I would say that from the very beginning he was showing evidence of a mental illness; from the beginning of his arrival at Bellevue."

The following questions and answers were given:

" The Court: Doctor, how did his various ideas and expressions become integrated and present themselves to you so that you finally decided that he was suffering from Dementia Praecox? The Witness: Well, on the basis of all our findings and our own examination at Bellevue Hospital, plus a good deal of material, which I have read concerning his case, reports of three other psychiatrists and the minutes of the Court, and going well into the man's background, his family history, his

early life, it has been *our belief that the man has been sick for a long time and that this thing has been gradually evolving, and becoming more and more progressive, and we think it will become more severe as time goes on.*"

At the hearing held by this court to determine whether or not the report of the Matteawan authorities dated February 9, 1950, should be confirmed, the psychiatrists attached to the Matteawan Hospital testified. Dr. Leon Wilner, one of the Matteawan authorities, in response to a question asked of him by the defendant himself, testified ·as follows:

" Q Insane right along during the 10 months that I was incarcerated in Raymond Street Jail? A No, No. I didn't know about Raymond Street Jail.

" Q I said, you admitted I was insane right along, leaving out Raymond Street? A I knew you were insane when you came to Matteawan, and you were insane for quite a while."

It should be noted that Dr. Wilner had the defendant under observation during the five years the defendant was in Matteawan State Hospital.

Dr. Richard Hoffman, who examined him in March, 1944, and then twice in September, 1944, felt that he was suffering from a psychopathic personality with super-imposed acute hallucinatory mania. Subsequently, Dr. Hoffman testified for the defense at the trial. Owing to the exigencies of the defense strategy as determined by the defendant himself, Dr. Hoffman's testimony bore only on the defendant's mental condition at the time of the commission of the crime. His expressed opinion as to the defendant's ability to distinguish between right and wrong and to know that his act was wrong was, therefore, one of the items of evidence submitted to the trial jury. Because of the defendant's adamant insistence on personally determining the type of defense he would interpose, there was unfortunately no way in which either counsel for the defense or Dr. Hoffman himself could apprise the court as to the witness' opinion regarding the defendant's mental state as of October, 1944, or regarding the defendant's insight into the nature of the charge against him or his capacity to make his defense.

The three Bellevue psychiatrists heretofore mentioned determined the defendant's insanity as schizophrenia (dementia praecox), paranoid type, which is a chronic progressive form of mental disease with deterioration of the mental faculties. Such a diagnosis implies that the defendant when examined in November, 1944, for a period of three weeks, at Bellevue Hos-

pital, must have been mentally sick during the period of October, 1944, when he was on trial. From this the conclusion is drawn ex post facto and in the opinion of the impartial Bellevue authorities, that the defendant could not have been in such a mental state as to confer with counsel, nor to understand the nature of the proceedings pending against him.

Subsequent commitment to Matteawan State Hospital, where the defendant was confined for a period of five years, drew the unanimous opinion of the Matteawan State Hospital authorities that Lewis Wolfe was suffering from a chronic mental disease known as manic depressive insanity with paranoid trends. Their description of the disease as of long-standing character, with its cyclical recurrences, affirms the Bellevue opinion that this man, at the time of his trial, could not have been in such a state as to confer with counsel or understand the nature of the proceedings against him.

As against the foregoing, there was nothing in the defendant's overt demeanor throughout the trial to suggest to the court or to any other layman that he was incompetent to defend himself. He maintained a relatively quiescent role as an observer during most of the proceedings. When he took the witness stand in his own behalf he appeared quite lucid and rational. On the whole he gave the substantial impression of great intelligence and gifted personality rather than one of mental abnormality, so that up to that point and on this cross-section of his conduct, so to speak, there was nothing to suggest to the court that he was incapable of understanding his situation. It was not until after the jury had delivered its verdict, that the behavior of the defendant suddenly worsened. At that point he arose and harangued the court and the spectators in such an unusual and rambling manner as to create, for the first time, a doubt in the court's mind as to his sanity and, more relevantly, as to his true awareness of the meaning of his trial and what it portended to him. This sudden and unforeseen development was one of the circumstances which disposed the court to grant counsel's subsequent motion to commit the defendant to Bellevue Hospital for observation. It is, furthermore, one of the factual happenings in the case which the court has earnestly considered in weighing both the evidence and the arguments advanced by counsel in support of the present application for a new trial.

The District Attorney in opposing this motion states that the law proceeds upon the theory of finality. In his moving papers in opposition to this motion, the District Attorney states that

the court had before it ample evidence of the defendant's then existing mental capacity and more than adequate opportunity to determine the question of law and fact relating to such sanity or lack thereof. He further argues that the record shows that the court did not err in permitting the trial to proceed to its conclusion and to the finality of the jury's verdict. The District Attorney further contends that in this case, finality has been arrived at and should be adhered to; that, were the rule otherwise, a defendant in a capital case would have a very simple election of procedure. In fact, he could do exactly what this defendant is attempting to do; that is, proceed to trial in the hope of an acquittal by the jury and then, when disappointed by the fact of a conviction, make a motion identical with that now before the court.

While it is true that the defendant (as one feature of his application) seeks a new trial, pursuant to the provisions of subdivision 7 of section 465 of the Code of Criminal Procedure upon the ground that upon another trial, the defendant can produce evidence which, if it had been received upon the trial, would probably have changed the verdict, the basis for the court's determination of this application, rests upon a proper interpretation of section 1120 of the Penal Law. What the District Attorney states about finality is correct. It is true that the law permits a defense of insanity for an act if the defendant was laboring under such a defect of reason as not to know the nature and quality of the act, or that it was wrong. This is a defense that is intended to be interposed upon the trial. Like other defenses, it is concluded by the result of the trial, whether it be interposed or not. Under our law, defendants are not permitted to have separate trials of their several defenses. It is obvious that the law never intended that a defendant might find out how he could get along without the defense of insanity and if unsuccessful have a new chance by claiming that he was insane. While it is true that the defendant seeks a new trial on the grounds of newly discovered evidence, a reading of the moving papers and the oral arguments advanced at the hearing for the motion for a new trial, clearly indicates that the defendant is not seeking a new trial for errors committed during the trial, nor has the defendant discovered evidence which if produced at the trial would have changed the verdict of the jury. If this were true the arguments advanced by the District Attorney would require a denial of this application. The defendant's more articulate contention is that the court was without authority to permit the trial to commence.

In the case of *People* v. *McElvaine* (125 N. Y. 596) the Court of Appeals discussed the history of the procedure and progress of the legislation with reference to the law of insanity. On pages 600–601 the court stated: " It is now a fundamental principle in all civilized countries that this defense, when established, shall furnish to the accused not only a protection against conviction for crime, but a sufficient reason why he should not be tried or sentenced, or if tried and convicted, why the judgment of the court should not be executed; and this rule has, for a long time, had been a part of the statutory law of this State. (§ 20, Penal Code; 2 R. S. 697, § 2.) These statutes express a humane principle, and the law makers of the state have, by numerous provisions, so guarded the rights of such persons, that they cannot be lawfully punished for an act which was committed by them while in a state of insanity, or when they have become insane during or after a trial or conviction. (§§ 336, 658, 481, Code of Criminal Procedure.) It is the duty, as it should always be the inclination, of courts to give effect to those provisions of law, and, so far as human judgment and intelligence can determine, to see to it that no person is punished for an act done while mentally incapable of distinguishing the character of such act, or is incompetent to understand and appreciate the cause and object of his punishment."

In American Jurisprudence (Vol. 14, Criminal Law, § 46) the editors write as follows: " Various remedies are available to one who has been convicted of a crime while insane. In some jurisdictions, an application for a writ of error coram nobis is proper; in others, the courts have recognized the right of the defendant, after conviction, to raise by a motion for a new trial, the question of his sanity at the time of trial."

In the case of *Hawie* v. *State* (121 Miss. 197) the defendant, after conviction of murder in first degree, filed an application with the trial court for a writ of error *coram nobis* on the ground of his insanity during the trial. At pp. 215–216 the court stated as follows: " The petition in this case clearly avers that George Hawie was insane at the time he was placed upon trial, and at the time he was actually tried and convicted. This the demurrer admits. Our consideration of the defendant's rights is, therefore, based upon the assumed fact that he was insane at the time he was tried, and his life forfeited by the final judgment of the Rankin county circuit court. The sole question presented is one of law. Does the petition state a case for relief? "

In *Jones* v. *State* (13 Ala. 153) the court by CHILTON, J., observed (p. 158): " The evidence strongly indicated, perhaps was conclusive, of the prisoner's insanity at the time of the trial. Under such circumstances, it was not proper that he should have been put upon his trial. By the humanity of the common law, a party who was insane at the time of the tria., could not be arraigned. If he became insane after his conviction, he could not be executed while he remained thus demented. See 1 Hawk. P. C. 3, § 3; 1 Hale, 34–5; 1 Russ. 13; 4 Bl. Com. 25.''

To the same effect is *Baughn* v. *State* (100 Ga. 554; note 38 L. R. A. 577) and other cases referred to in the attached case noted. Mr. Bishop says: " If an indicted person is not sane, the court cannot go on with the case; or if he becomes insane after the trial commences he can neither be sentenced, nor, if sentenced, punished, while his insanity continues.'' (1 Bishop's New Criminal Law [8th ed.], § 396, par. 2.)

" From these authorities it unquestionably follows that if the defendant in this case was insane, the court was in error in placing him upon trial and in pronouncing the judgment of conviction. The fact of the prisoner's insanity was not known either by court or counsel. There was an error of fact which led to an unlawful trial. It must be remembered that we are not here dealing with any alleged errors in reference to the indictment, arraignment, or the actual conduct of the trial itself. The rulings of the trial court on the merits of the case are not presented. We are confronted with an.error of fact which was unknown to the court and one which, if the court had known, would have prevented any trial whatever.'' (*Hawie* v. *State*, 121 Miss. 197, 219, *supra.*)

In the case of *Sanders* v. *State* (85 Ind. 318) the court (pp. 328, 329) stated: " That courts possess inherent powers not derived from any statute is undeniably true. Among these powers are the right to correct their records so as to make them speak the truth, to pass upon the constitutionality of statutes, to prevent the abuse of their authority or process, and to enforce obedience to their mandates. If it were granted that courts possess only such rights and powers as are conferred by statute, they would be mere creatures of the Legislature, and not independent departments of the government. They are not mere creatures of the Legislature, but are co-ordinate branches of the government, and in their sphere are not subject to legislative control. *Deutschman* v. *Town of Charlestown*, 40 Ind. 449; Cooley Const. Lim. 114, 116; 2 Story Const. 377.''

In the case of *Freeman* v. *People* (4 Denio 2) the philosophy of our common law with regard to the law of insanity was enunciated. The court stated as follows (pp. 19–20) : " ' If a man, ' says Sir William Blackstone, ' in his sound memory commits a capital offense, and before arraignment for it he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried: for how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if after judgment he becomes of non-sane memory, execution shall be stayed, for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution.' ' '

The Court of Appeals has recognized and affirmed that although the Code of Criminal Procedure establishes the practice in all criminal cases, the courts retain certain inherent prerogatives. Thus, in *People* v. *Gersewitz* (294 N. Y. 163, 167) the court stated: " In a long line of cases this court has consistently applied the principle that the Code of Criminal Procedure ' establishes the practise in all criminal cases and the authority for the orders and judgments of the courts ' within the field where the Legislature may grant authority to a court or may withhold it. (*People ex rel. Hirschberg* v. *Orange Co. Ct.,* 271 N. Y. 151, 155.) The court has nontheless recognized, at the same time, that courts 'have always asserted and exercised authority which, though perhaps not expressly established by statute, is ' based upon the inherent right and duty of the courts to protect the citizen in his constitutional prerogatives and to prevent oppression or persecution.' ' It is a power,' the court said, ' which the legislature can neither curtail nor abolish, and, to the extent that legislative enactments are designed to effect either of these ends, they are unconstitutional.' (*People* v. *Glen,* 173, N. Y. 395, 400.) ' '

This same principle of Law was enunciated by the Court of Appeals in the case of *Matter of Lyons* v. *Goldstein* (290 N. Y. 19, 25) wherein the court stated: " It would be an extraordinary reversal of all precedent to deny to a competent tribunal power over its own judgments in either civil or criminal cases."

There is no doubt in the court's mind that it has the power to entertain this application. The authorities cited both in this and other States amply establish that fact. It remains to

examine the arguments presented to sustain the application and the facts upon which such arguments are predicated.

At this point the court wishes to pay a deserved tribute to the learned attorneys who have appeared in this case. Mr. Nicholas Pecora has been indefatigable in his efforts to protect the interest of his client. His lucid and incisive reasoning on the facts and on the law are in the best tradition of the great trial lawyers. He has handled with great patience and great dignity what has manifestly been a case of exceptional difficulty from every standpoint. Mr. Herbert Walters' scholarly study of legal precedents and his equally scholarly research in the pertinent areas of medical and psychiatric literature and authority hardly need to be acknowledged. His presentation of his findings in this connection, both by affidavit and by oral argument, is a most eloquent and enlightening contribution to the record of the case and to the annals of the court. Mr. William I. Siegel has represented the District Attorney's office not only with fairness and fidelity but with great legal and analytical acumen. His task was made doubly difficult by reason of the fact that he was required to make two separate studies at different times of two separate sets of facts submitted or alleged in support of the defendant's application. His detailed written and oral analyses have been of great assistance to the court in working toward a critical evaluation both of the expert testimony adduced and of the arguments advanced by counsel for the defense. This court further wishes to thank all three gentlemen for their patient and sympathetic understanding of the difficulties which confronted it, arising out of the intricate and, in certain respects, unprecedented problems which presented themselves.

It is fundamental that every defendant is entitled to a fair trial and in a criminal case, this is especially the rule. If the rule were otherwise, it would be a reproach to the true administration of justice. The prosecution and trial of a criminal case casts grave responsibilities upon District Attorney and defense counsel and upon the Trial Judge. Each in his own way must perform his sworn duty and always be conscious of the fact that both the People and the defendant are entitled to a fair trial. The essential question in this case comes down to this. Has the defendant had a fair trial within the meaning of our law and the ideals upon which our law has its foundation?

Frankly, the court has had this question under advisement ever since the sentence of death was pronounced on March 20, 1950, and even before the formal petition for a new trial was sub-

mitted. It has been gravely concerned about the following events, all of which transpired after the completion of the trial, and about their retroactive import on the defendant's mental condition during the trial:

(1) The fact that, immediately after the return of the jury's verdict the defendant began to act and speak irrationally and in such a manner as to preclude the probability that he was malingering or simulating insanity, or otherwise attempting to perpetrate a fraud upon the court or to gain sympathy for himself.

(2) The fact that upon commitment to Bellevue Hospital a few days after the verdict, the defendant was found to be suffering from schizophrenia (dementia praecox) paranoid type and the further fact that it was the sworn opinion of the examining psychiatrists, who had no partisan interest in the case, that the disease must have been present at the time of trial.

(3) The fact that the opinion of the Bellevue Hospital psychiatrists was subsequently confirmed by the psychiatric staff of the Matteawan State Hospital where the defendant was a patient for more than five years before being certified (on February 9, 1950) as having recovered his insight to a sufficient extent to be by then capable of understanding the nature of the charge against him and of making his defense. Although the Matteawan psychiatrists later *reversed their opinion as to the defendant's having recovered,* they at no time altered their conclusions as to the intensity of the defendant's mental malady at the time of his admission to the Matteawan institution shortly after the trial.

(4) The fact that Drs. Berg and Feinier, although differing from the Matteawan psychiatrists to the extent that they believed the defendant to be well oriented (in all except one respect) and capable of standing trial as of March, 1950, nevertheless concurred in the opinion of both the Bellevue and Matteawan authorities that there had been an onset of a severe manic-depressive psychosis earlier.

(5) The fact that the expert psychiatric testimony as it appears everywhere on the record is overwhelmingly to the effect that the defendant was insane at the time of his trial. The only dissenting opinion is that of Dr. Thomas S. Cusack, who testified as an expert for the People at the time of the trial and gave it as his opinion that the defendant was sane. It is to be noted that of all the ten psychiatrists who appeared in the case, Dr. Cusack was the only one who did not examine the defendant clinically. His knowledge of the defendant was confined merely

to observation of the defendant's courtroom demeanor and, in any event, his testimony amounted to no more than an answer to a hypothetical question propounded to him by the assistant district attorney who was prosecuting the case. The basis for Dr. Cusack's opinion was so tenuous, as compared with that which underlay the other expert's opinions, that the court is obliged to place correspondingly less reliance upon it.

(6) The fact that one month before the commencement of the trial the defendant was diagnosed as insane by Dr. Richard Hoffman, a psychiatrist of well-established reputation and prestige, who had been retained by counsel to examine him.

(7) The fact that the defendant himself expressly enjoined upon his attorney, before the trial, a plan of defense which effectively prevented the court from knowing or suspecting that he might be mentally incapable of standing trial and which also prevented the pre-trial findings of Dr. Hoffman from being spread upon the record.

The foregoing items of fact which are not in controversy lend considerable weight to the arguments on the law which have been advanced in behalf of this application. On the basis of its consideration of them and from the vantage point of six years of retrospect, the court is of the conviction that the circumstances of this case bring it into consonance with the philosophy which gave to jurisprudence the maxim of Sir William Blackstone, and which bears repetition here: " If a man in his sound memory commits a capital offense, and before arraignment for it he becomes mad, he ought not to be arraigned for it, because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried: for how can he make his defense?" (IV Blackstone's Comm., p. 24.)

In the case of *People* v. *Pershaec* (172 Misc. 324) Judge Cornelius F. Collins of the Court of General Sessions, wrote a lengthy opinion interpreting sections 658 to 662 of the Code of Criminal Procedure, which deals with the procedure as it affects insane persons. Discussing section 1120 of the Penal Law, Judge Collins stated (p. 330): " This act is undoubtedly declarative of the common law, except that it may be said that the part relating to responsibility for crime is of statutory origin, following the rule laid down in an English case of the last century and referred to as the M'Naghten Formula. It is quite clear that the obligation is on the court to determine whether or not a defendant is in such a state of idiocy, imbecility, lunacy or insanity as to make it incumbent on such court to see that

he is not put to trial, or sentenced, if there has been a conviction or trial. This element is an absolutely necessary subject for determination, apart from the adjudication of criminal responsibility and often involves the distinction between so-called ' medical ' and ' legal ' insanity or responsibility, though a conclusion as to the latter is not a necessary factor to stay trial or sentence.''

From all the evidence adduced before it, the court is constrained to find that the application for a new trial is meritorious. It is convinced beyond any doubt, both from its own observation of the defendant's behavior and conduct over a period of some six years and from the testimony of the various expert witnesses whom it has examined, that the defendant has not been feigning insanity or otherwise seeking to impose upon the credulity of his lawyers or the offices of the court; that he is not therefore endeavoring, as the District Attorney has contended, to avail himself of an alternative means of defense. More specifically, the court is of the belief that at the time of his trial, the defendant's mental condition was such as to cast grave doubt upon his capacity to defend himself properly. It is to be understood, however, that this opinion applies only to the defendant's mental capacities at the time of his trial. The court can make no determination of the defendant's responsibility for the commission of the crime charged against him. The passage of time between the criminal act itself and the first diagnosis of insanity by a qualified psychiatrist puts the question of responsibility into the realm of speculation, at least insofar as the court or any other layman may presume to pass upon it. And, in any event, the question of criminal responsibility, as defined in section 1120 of the Penal Law, is for a trial jury to pass upon, if the defendant elects to interpose a defense along this line.

On the basis both of the evidence adduced and of the arguments advanced for and against this motion, the court finds that the uncontroverted facts, the legal precedents and the philosophy of our criminal jurisprudence, as well as the pertinent statute itself — all require that this defendant's trial for murder in the first degree be now declared a nullity.

The court directs that counsel for the defense submit an order in accordance with the terms of this decision; the said order shall provide that the defendant, Lewis Wolfe, be returned to the Tombs Prison, New York County, where he shall be held until brought to trial or legally discharged.